## L. PAYNE *v.* THE WESTERN & ATLANTIC RAILROAD COMPANY *et al.*

1. CORPORATION. *Tort of agent.* Corporations are liable for the tortious acts of agents in the interest of the corporation, and in pursuance of general or special authority, if within the apparent scope of corporate powers.

2. LIBEL AND SLANDER. The mere posting of a notice by an employer to employes, maliciously forbidding them to trade with a certain person therein named, does not constitute slander or libel.

3. ACTION. *Lawful act.* It is not unlawful for a railroad company to discharge, nor to publish notice that it will discharge hands for trading with a certain merchant, unless thereby a contract between the company and employes is broken; even then no action lies to the merchant unless the notice be libelous.

4. Same. "Threats and intimidation" in a legal sense, import not merely an evil, but an unlawful act about to be done.

5. Action. *Malice.* No action lies to the merchant against the company or another for such notice, though it be posted maliciously and operate to deter employes of the company and others from trading with him and thus ruin his business. An act not unlawful, done in a manner not unlawful, though from wicked and malicious motives, and causing injury, is not actionable.

## FROM HAMILTON.

Appeal in error from the Circuit Court of Hamilton county. D. C. Trewhitt J.

Elder & White for Payne.

Cooke & Cooke for Railroad Company.

Ingersoll, Sp. J., delivered the opinion of the court.

The question in this case is as to the sufficiency of the declaration. The circuit judge sustained the demurrer and dismissed the suit. The Referees recommend reversal of the judgment. The suit is against a railroad company and its general agent, and the declaration of plaintiff is as follows:

"That, on the 16th day of February, 1883, and for many years previous thereto and continually since, plaintiff has been engaged in business as a merchant in Chattanooga, Tennessee, and operating a store on Market street at and near the depot, car-shed, railroad track and yard of the defendant, the Western & Atlantic Railroad Company. Plaintiff has at all times sustained a good character; and by close attention to business, and honest and fair dealing plaintiff had, on the 16th of February, 1883, built up and

Payne *v.* Railroad Company.

fully established a large, extensive and profitable business; the defendant, the Western & Atlantic Railroad Company, is a large and wealthy corporation, operating and controlling a line of railroad leading from Chattanooga, Tennessee, to Atlanta, Georgia. That said corporation employs a very large number of hands both in and out of Chattanooga; there are also four other railroads coming into Chattanooga, all intimately associated with the defendant railroad company in business relations. Plaintiff's store is located nearly in the center of five railroad *termini* leading into the city. Plaintiff had built up and was enjoying, on the day and year aforesaid, a large, extensive and profitable business with the employes of all the aforesaid railroads; especially was he selling many goods to and doing a large business with the agents and employes of the defendant railroad company both in Chattanooga and along the line of said railroad; he had also built up a large trade along the line of said railroad, both buying and selling goods to persons living along the line of said road, other than employes. The defendant, J. C. Anderson, is the general agent of the defendant railroad company at Chattanooga, having in charge and controlling the employes in Chattanooga, Boyce Station and elsewhere along the line of said railroad. And the said plaintiff further declares that, while so engaged in his legitimate and profitable business * * * * the said defendants wickedly, unlawfully, fraudulently and maliciously conspired and confederated together out of malice, ill-will and wicked feeling to break up, injure,

damage and ruin plaintiff in his business; and, to that end and for that purpose, they, the said defendants, on the day and year aforesaid, did make, publish and circulate the following scandalous and injurious order, threat, command and paper writing, to-wit:

FEBRUARY, 16, 1883.

J. T. Robinson, Y. M.—Any employe of this company on Chattanooga pay-roll who trades with L. Payne from this date will be discharged. Notify all in your department.                    J. C. ANDERSON, Agent.

The said J. T. Robinson is and was yard-master in the employ of the defendant railroad company, controlling and having under him a large number of hands. Like orders and commands were addressed and sent to other heads of departments of said railroad; and the same were posted and published by defendants and read and commented upon all along the line of said railroad among and by plaintiff's patrons and customers. Plaintiff further declares that, by reason of said order and command, and other means used by defendants he was brought into reproach, disrepute, suspicion and distrust, and his business broken up and ruined. The employes of the defendant railroad company deterred and intimidated by the threat contained in said illegal command and order, quit trading with plaintiff because of the illegal and malicious interference, threats and combination of defendants, and his business far and near has been greatly damaged and ruined, to his damage," etc.

In the second count the plaintiff, setting forth, as in the first, his lawful and lucrative business and good character and repute as a merchant, and the power, wealth and influence of the railroad company and its

employment of many persons, who traded with him, but omitting any averment of Anderson's agency, complains, that "the defendants unlawfully, wickedly, wantonly, maliciously and out of their malice towards him, the plaintiff, undertook by means of threats, insinuation, innuendoes, slander and other means to oppress, injure, damage and ruin plaintiff in his legitimate business and destroy his character; and ¦by the means and for the purpose aforesaid, and, with said wicked motive, did oppress, injure, damage and ruin plaintiff's business, character and reputation; that the said defendants threatened, among other things, to discharge any of the employes of said railroad company who should 'trade with plaintiff, and this was published far and near by defendants, whereby not only said employes were deterred from trading with him, but he was brought into reproach, disrepute and suspicion, and lost his other trade and custom," etc.

The difference between the two counts is: First: In the first Anderson is described as the Company's agent; and in the second he is not. Second: In the first the posted notice is set out *ipsissimis verbis;* while in the second its publication and purport are alleged in general terms.

The demurrer of defendants contains the following grounds of objection to the declaration:

First: Defendants had the right to discharge employes because they traded with plaintiff, or for any other cause.

Second: If they had no such right, the act was merely a breach of the contract of employment for which plaintiff had no right of action.

Third: Plaintiff had no vested right in the trade of defendauts' employes; wherefore they had the right to prefer employment by defendants to trading with plaintiff, and consequently to withdraw their trade from him, and he could not sue defendants therefor.

Fourth: The order complained of was not libelous in itself, nor is it made so by *innuendo*, nor is there any matter alleged which is actionable.

Fifth: The railroad company demurs, because it could not be liable for the unauthorized wrongful act of its agent, Anderson, not within the line of his duty.

Sixth: Anderson had a right to hire and discharge employes without direction from any one, and for any wrong done defendants would be liable only to the employes so discharged.

The only distinctive feature of the last ground of demurrer seems to be the assertion of Anderson's right to hire and discharge employes without direction from the railroad company, the latter part, asserting the limitation of liability to the employe for wrong done, being embraced in a former head of demurrer. The peculiar ground relied on in this head is obnoxious to the objection that it is a speaking demurrer, for in the second count of declaration it does not appear that Anderson was even the agent of the railroad company; and in the first, though the agency is alleged, it does not appear that he possessed the extent of authority asserted for him in the demurrer. Wherein it is peculiar, therefore, this ground of demurrer is not well taken.

The fifth ground above set forth is untenable as

.to the second count, because of the absence therefrom of any allegation of the agency of Anderson; and as to the first count, because first, instead of wanting in an averment of the authority of Anderson as agent of the company, it alleges expressly a combination and conspiracy between principal and agent to do the alleged wrong to plaintiff, and a participation by both in the act complained of; and second, corporations are liable for the tortious acts of its agents within the apparent scope of corporate powers, which are done in the interest of the corporation and in pursuance of any general or special authority: Cooley on Torts, 119, 120.

The objection to the declaration as one for libel or slander is well taken. The published order set out in the first count not only contains no libelous statement, but it has in it no reference even, direct or indirect, to the *character* of plaintiff. There is no *innuendo* in the count, and it is not easy to see what statements or references therein contained would support one, and this may explain its absence. Let it suffice, that no libel or slander is made out directly or by imputation even, in the count which sets out the writing. The second count bears no resemblance to a declaration in libel or slander. It sets out no writing or spoken words even, -but merely contains a general charge that defendants undertook by means of "insinuations, innuendos, slander and other means to oppress, injure," etc. Malice is freely charged, and the charge is frequently repeated in both counts. But there is no suggestion even of any *false* statement,

33—VOL. 13.

written or spoken by defendants or either of them. Without this, of course, no action for libel or slander can be maintained; for no amount of malice will compensate for the absence of falsehood in the legal requirements of this kind of action. The suit is not maintainable, therefore, as an action of libel or slander, either to personal character or business reputation. It must stand, if at all, upon the alleged malicious and unlawful conspiracy and combination, and wicked conduct of defendants, for the purpose and with the effect to deprive plaintiff of his customers, and thus oppress, injure and ruin him in his trade.

This, rather than libel or slander, is the particular wrong and injury specially relied on by plaintiff. As concisely put in argument by his counsel:

"We have brought a suit to recover damages because defendants, by threats and intimidations, prevented people from trading at our store."

The full scope of his argument is:

"The declaration sets up, that plaintiff was pursuing a lawful business—that of a merchant; and that defendants, out of malice and ill-will toward him, entered into an unlawful confederation and conspiracy to break him up; and that pursuant to such unlawful purpose, by means of threats, force and intimidation, they drove his customers from him and succeeded in breaking up his business."

"Lawful competition is allowed, but not a conspiracy forcibly and by threats and intimidation to interfere with another's legitimate business."

"The good-will of a business is the subject of ac-

quired right and can be bought and sold as other property."

"Defendants not only maliciously invaded and weakened plaintiff's legal right to the good-will in his business, but by their threats, intimidation and force destroyed this acquired right."

"He, who invades, weakens or destroys a legal right maliciously, is liable in damages therefor."

"Every malicious act is wrongful of itself in the eye of the law; and, if it cause damage or hurt to another, it is a tort, and may be made the foundation of an action."

"When a violent or malicious act is done to a man's occupation, profession or way of getting a livelihood then an action lies in all cases."

The defendants did do a malicious, injurious act to plaintiff's occupation, and hence they are liable."

To this forcible statement of plaintiff's case, defendant's answer in effect is: We have a right to employ, or not employ, when and whom we choose. We may discharge our employes, all or singly, whenever we choose; with or without reason; because they trade with plaintiff or do not trade with him; and, if the employes are injured or wronged thereby, they may sue; but plaintiff cannot. It is purely a matter of contract between the company and its employes; and, if a contract has been broken, only a party to the contract, or one in privity, can sue for its breach. Plaintiff shows no such privity, and therefore cannot maintain this action, unless defendant has done some unlawful act, which caused the injury

complained of; the only act complained of is the notice to hands that they will be discharged if they trade with plaintiff. This, being merely the exercise of an undoubted right by defendant, cannot give plaintiff a right of action, even though the act was maliciously done, and the plaintiff suffered injury therefrom; because malice does not furnish ground for civil action. Wrongful *acts* alone are actionable. And, as to the conspiracy alleged, though it may be actionabe, it does not become so until some wrongful act is done under it; and, since the only act alleged here is not unlawful, but permissible to defendant, this action is not maintainable for conspiracy, for want of the wrongful act done under it; lacking this, the suit must fail, though there be a conspiracy and malice toward the plaintiff, and, in consequence thereof, and of the *lawful* act of defendants thereunder, plaintiff lost his customers and profits, and so failed in his business.

Plaintiff, in reply to this, besides asserting the correctness of his original position, denies that the defendants had the right to discharge or threaten to discharge employes for trading with him, because the concession of such authority and its exercise by strong corporations and large manufacturers would unfairly defeat and destroy competition, and tend to create monopoly in trade; whereas, the law should discourage the latter and foster the former. Plaintiff also insists, that, while our decisions furnish no precedent for his suit, and we have no statute whatever upon the subject, the cases cited by Mr. Addison in the first volume

Payne *v.* Railroad Company.

of his work on Torts, chapter 1, section 1, afford abundant authority for this action.

The novelty, interest and importance of the questions demand a careful examination of the cases and the principles involved. The case turns upon the common law. The first question is: Is it unlawful for one person, or a number of persons in conspiracy, to threaten to discharge employes if they trade with a certain merchant? Would it be unlawful to discharge them for such reason? If not, it surely would not be unlawful to "threaten" it.

If the employes are engaged for fixed terms, it may be assumed that a discharge by the employer for such a reason would be unwarranted, and would give the employe an action for breach of contract. But no one else, except a privy, could complain of the breach of contract, and the ground of the employe's action would be the refusal of the employer to pay him for the period promised in the contract of service. If the service is terminable at the option of either party, it is plain no action would lie even to the employe; for either party may terminate the service, for any cause, good or bad, or without cause, and the other cannot complain in law. Much less could a stranger complain. No action could accrue either to employe or stranger for breach of contract; for no contract is broken. If the act is unlawful it must be on other grounds than breach of contract, as, that it unjustly deprives plaintiff of customers and trade to which his fair dealing entitles him, and thus destroys his business.

For any one to do this without cause is censurable

and unjust. But is it legally wrong? Is it unlawful? May I not refuse to trade with any one? May I not forbid my family to trade with any one? May I not dismiss my domestic servant for dealing, or even visiting, where I forbid? And if my domestic, why not my farm-hand, or my mechanic, or teamster? And, if one of them, then why not all four? And, if all four, why not a hundred or a thousand of them? The principle is not changed or affected by the number. And, if it were, who should say how many it would be lawful and how many unlawful to forbid? Nor can it be better determined by effect than by number. To keep away one customer might not perceptibly affect the merchant's trade; deprived of a hundred of them he might fail in business. On the contrary, my own dealings may be so important that, if I cease to trade with him, he must close his doors. Shall my act in keeping away a hundred of my employes be unlawful, because it breaks up the merchant's business, and yet it be lawful for me to accomplish the same result by withholding my own custom?

Obviously the law can adopt and maintain no such standards for judging human conduct; and men must be left, without interference to buy and sell where they please, and to discharge or retain employes at will for good cause or for no cause, or even for bad cause without thereby being guilty of an unlawful act per se. It is a right which an employe may exercise in the same way, to the same extent, for the same cause or want of cause as the

Payne v. Railroad Company.

employer. He may refuse to work for a man or company, that trades with any obnoxious person, or does other things which he dislikes. He may persuade his fellows, and the employer may lose all his hands and be compelled to close his doors; or he may yield to the demand and withdraw his custom or cease his dealings, and the obnoxious person be thus injured or wrecked in business. Can it be pretented that for this either of the injured parties has a right of action against the employes? Great loss may result, indeed has often resulted from such conduct; but loss alone gives no right of action. Great corporations, strong associations, and wealthy individuals may thus do great mischief and wrong; may make and break merchants at will; may crush out competition, and foster monopolies, and thus greatly injure individuals and the public; but power is inherent in size and strength and wealth; and the law cannot set bound to it, unless it is exercised illegally. Then it is restrained because of its illegality, not because of its quantity or quality. The great and rich and powerful are guaranteed the same liberty and privilege as the poor and weak. All may buy and sell when they choose; they may refuse to employ or dismiss whom they choose, without being thereby guilty of a legal wrong, though it may seriously injure and even ruin others.

Railroad corporations have in this matter the same right enjoyed by manufacturers, merchants, lawyers and farmers. All may dismiss their employes at will, be they many or few, for good cause, for no cause

or even for cause morally wrong, without being thereby guilty of legal wrong. *A fortiori* they may " threaten " to discharge them without thereby doing an illegal act, *per se.* The sufficient and conclusive answer to the many plausible arguments to the contrary, portraying the evil to workmen and to others from the exercise of such authority by the great and strong, is: They have the right to discharge their employes. The law cannot compel them to employ workmen, nor to keep them employed. If they break contracts with workmen they are answerable only to them; if in the act of discharging them, they break no contract, then no one can sue for loss suffered thereby. Trade is free; so is employment. The law leaves employer and employe to make their own contracts; and these, when made, it will enforce; beyond this it does not go. Either the employer or employe may terminate the relation at will, and the law will not interfere, except for contract broken. This secures to all civil and industrial liberty. A contrary rule would lead to a judicial tyranny as arbitrary, irresponsible and intolerable as that exercised by Scroggs and Jeffreys.

But plaintiff says that the defendants *wickedly and maliciously combined and confederated* for the unlawful purpose of causing plaintiff's customers, by means of threats and intimidation, to leave off trading with him; and that the unlawful purpose was accomplished by these means, and thus plaintiff's business was ruined and he caused to suffer great pecuniary loss; and he urges that defendants are liable in damages

therefor, because every act done fraudulently or ma-
liciously and for the purpose and with the effect of
injuring another in his lawful business gives good
cause of action; and so the Referees have reported;
and therefore they recommend the reversal of the judg-
ment sustaining the demurrer.

If defendants, by means of "threats and intimida-
tions," have driven away plaintiff's customers and
thus destroyed his trade, they have injured him by
an unlawful act, and are liable to him in damages,
whether they did it wickedly and maliciously or not.
For it is unlawful to threaten and intimidate one's
customers; and the loss of trade is the natural and
proximate result of such acts. But "threats and in-
timidations" must be taken in their legal sense. In
law a threat is a declaration of an intention or de-
termination to injure another by the commission of
some unlawful act; and an intimidation is the act of
making one timid or fearful by such declaration. If
the act intended to be done is not unlawful, then the
declaration is not a threat in law, and the effect
thereof is not intimidation in a legal sense. So too of
the alleged conspiracy. A conspiracy is an agreement
between two or more persons to do an *unlawful* act.
If the act to be done is not unlawful, then the agree-
ment or combination is not a conspiracy. The ques-
tion then is, what were the acts done, or intended or
agreed to be done, by which the trading was prevented?

In the second count, which plaintiff specially relies
on to sustain this view of his case, after charging gen-
erally the use of threats and intimidation, he specifies.

as follows: "The said defendants threatened, among other things, to discharge any man in the employ of said railroad company who should trade with plaintiff, and this threat was published," etc. This is the only "threat or intimidation" specified. But this act was not unlawful as we have seen, and to denounce a determination to do it and thus deter customers from trading with plaintiff, was not "threat or intimidation" in a legal sense. From this it is fairly inferable that, in this count as in the first, plaintiff, though he uses the general terms "unlawful and malicious threats," refers only to the so-called "threat" to discharge employes and rests his case upon it. Presumably he has particularized the most wrongful act, or, at the most, the other "unlawful and malicious acts" are of the same, and no worse character than that specified. This act, he says, was done by the defendants *wickedly and maliciously* with the intent and effect of breaking up his business.

The question then is: Is an act not unlawful, rendered actionable to the one suffering injury therefrom, because it is committed wilfully, wickedly and maliciously, and in pursuance of a conspiracy to do the injury suffered? Does one render himself liable in damages for maliciously and wickedly exercising his rights or denouncing his intention of so doing, if thereby he injures another?

The cases relied on by plaintiff, cited by Mr. Addison in his work on Torts, sections 20, 22, where tenants were driven away from holdings, scholars frightened from school, persons prevented from trading at

Payne *v.* Railroad Company.

·one's store or with his vessel, buyers and workmen driven from a quarry, do not serve as precedents, for the reason that in all of them the defendants either committed or threatened unlawful acts.    In most of them violence was used or menaced; in some, statutory misdemeanors were committed, in others fraud, duress or libel was resorted to.    This relieved the cases of the difficulty or doubt which exists in this, where there is no libel, violence or broken statute.    In section 40, however, it is declared broadly, that "every malicious act is wrongful in itself in the eye of the law, and if it causes hurt or damage to another it is a tort, and may be made the foundation of an action." Upon this plaintiff relies, and upon it the Referees have based their report; and if this broad statement contains a correct exposition of the law they are right, and the demurrer should be overruled, for the declaration abounds in charges of malice and wrong.    But is this the law?

To answer this correctly it must first be understood what is meant by "malicious act."    In common parlance it is an act proceeding from hatred or ill-will, or dictated by malice, or done with wicked or mischievous intentions or motives.    But surely this cannot be the sense in which the phrase is employed by Addison; for if it were, then my neighbor would be liable to me, if from ill-will or wicked motive he refused to let me get water at his spring; or to make a road for myself across his farm, or locked his pump or his gate against me, or built a fence on his own land across my path; or built his store or shop or a high

fence on his own land in such close proximity to my windows as to exclude light and view; or digged on his lot below the foundation of my house so as to endan-. ger it. It is unreasonable that actions should be maintained for any of these things. For, though my neighbor is causing me hurt, and that too from wicked motives, and is thus violating the moral law, he is only exercising his undoubted right to use his own for himself and deny me all privilege in it; and this the law does not punish as has been often ruled in courts of the highest character: *Story* v. *Odin*, 12 Mass., 157; *Mahan* v. *Brown*, 13 Wend., 261; *Auburn & Cato Railroad Company* v. *Douglass*, 5 Seld., 447; *Lasala* v. *Holbrook*, 4 Paige, 169; *Thurston* v. *Hancock*, 12 Mass., 220.

Judge Cooley, in his work on Torts, page 278, says: "It is a part of every man's civil rights that he be at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice or malice. With his reasons neither the public nor third persons have any legal concern." And again on page 688: "The exercise by one of his legal right cannot be a legal wrong to another. * * * Whatever one has a right to do another can have no right to complain of." This he considers a mere truism.

Baron Parke said in *Stevenson* v. *Newnham*, 13 C. B., 285: "An act which does not amount to a legal injury cannot be actionable because it is done with a bad intent." And Judge Black, in *Jenkins* v. *Fowler*, 24 Penn. St., 308, declares: "Any transaction which

would be lawful and proper, if the parties were friends,
cannot be made the foundation of action merely be-
cause they happened to be enemies.   As long as a
man keeps himself within the law by doing no *act*
which violates it, we must leave his motives to HIM
who searches the heart."   Judge Cooper, in accord-
ance with these views, has declared in *Macey* v. *Chil-
dress*, 2 Tenn. Ch., 442: "It is no *defense* to a legal
demand, instituted [in the mode prescribed by law,
that the plaintiff is actuated [by improper motives.
The motive of a suitor cannot be inquired into.   Were
it otherwise, nearly every suit would degenerate into
a wrangle over motives and feelings."   The question
was ably argued and received elaborate consideration in
the Supreme Court of Maine in the recent case of *Hey-
wood* v. *Tillson*, 46 Am. Rep., 373; wherein it was
decided without dissent that no action lies by the
owner of a house against one who maliciously refuses
to employ any tenant of such house and thus prevents
the renting.   Indeed, the contrary ruling would lead
to evils innumerable.   It would be unendurable that
our courts of law should be perverted to the trial of
the motives of men who confessedly had done no un-
lawful act.   It is suggestive of the days of "construc-
tive treason."

Upon both reason and authority it seems obvious,
therefore, that the phrase "malicious act" cannot be
used by Mr. Addison in this connection in the pop-
ular signification, as understood and applied by the
Referees in this case; or if so used by him it is not
a correct statement of the law:

In another sense it is correct.    Prof. Greenleaf, in his 2nd volume on Evidence, section 453 (2), thus defines a malicious act: "In a legal sense, any *unlawful* act, done wilfully and purposely to the injury of another, is, as against that person, malicious." To determine then, whether a "malicious act" is "wrongful," in the legal sense, and therefore actionable, we must first determine whether it is unlawful.    But if unlawlul, and injurious, it is actionable, irrespective of the motive; and whether malicious or not, if not unlawful and injurious, then it is not actionable, even though malicious and wicked.

Plaintiff appeals with confidence to the legal maxim: There is no wrong without its remedy.    Far be it from us to shake the public and professional confidence in this venerable maxim of the English common law.    Its influence has long been and will long continue most wholesome in preventing the private redress of real and imaginary wrongs.    But as it is a legal maxim, it must be taken in a legal sense.    So taken it can obviously mean no more than that there is a legal remedy for every legal wrong, *i. e.*, every injury suffered as the consequence of an unlawful act, or a lawful act done in an unlawful manner.    Neither is shown here.    Defendants have merely warned their employes not to trade with plaintiff; if they do they must give up their employment.    They had the right to discharge them on this ground; it was not unlawful, but highly proper, therefore, to give them warning of their intention.    The manner of giving the warning was not unlawful or even censurable.    The posted notice con-

Payne v. Railroad Company.

tained no word of slander, libel or reproach .upon the
character of plaintiff; no charge or insinuation that
he was dishonest or unfair in his dealing. Omitting
any attack on plaintiff's character as a man or trader,
defendants, in the usual manner, and in a few harm-
less words, told its employes to stop trading with him
or they must stop working for them. The common
law does not forbid such an act, nor has our Legisla-
ture yet endeavored to make such an act unlawful by
statute, as has been done in some of the States, and
probably in England. No legal wrong has been done;
therefore there is no legal remedy. For the moral
wrong of the act, if there be any, defendants may be
called to account in another tribunal. Courts admin-
istering the civil law cannot punish sin or wickedness
unless it be committed in violation of the civil law,
which is the measure of their jurisdiction.

Nor will the maxim "*sic utere tuo, ut alienum non
lædas*" aid the plaintiff in his contention. As com-
monly translated," "So use your own as not to injure
another's," it is doubtless an orthodox moral precept;
and in the law, too, it finds frequent application to
the use of surface and running water, and indeed
generally to easements and servitudes. But strictly,
even then it can mean only: "So use your own
that you do no legal damage to another's." Legal
damage, actionable injury, results only from an unlawful
act. This maxim also assumes, that the injury results
from an unlawful act, and paraphrased means no more
than: "Thou shalt not interfere with the legal rights
of another by the commission of an unlawful act;"

or "Injury from an unlawful act is actionable." This affords no aid in this case in determining whether the act complained of is actionable, that is, unlawful. It amounts to no more than the truism: An unlawful act is unlawful. This is a mere begging of the question; it assumes the very point in controversy, and cannot be taken as a *ratio decidendi.*

A majority of the court, therefore, conclude that the act done, *i. e.,* the publication of the notice that the company would discharge employes who traded with plaintiff, was not an unlawful threat nor an unlawful act; was not a libel; and, though done wickedly and maliciously, and in pursuance of a wicked design, is still not actionable, because it was not an unlawful act, nor an act done in an unlawful manner.

The report of the Referees will therefore be set aside, and the judgment of the circuit court affirmed.


FREEMAN, J., delivered the following dissenting opinion. TURNEY, J., concurring:

The declaration in this case in the first count is substantially that plaintiff occupied a store in the city of Chattanooga, in the center of five railroad *termini* leading into the city, and had built up a large and profitable business with the employes of said roads, and was especially selling many goods and doing a large business with the agents and employes of the defendant company, and that defendants conspired to break up, injure and destroy him, by issuing an order

from the superior officer, J. C. Anderson, to the yard-master of the road to the effect as follows:

J. T. Robinson, Y. M.—Any employe of this company on Chattanooga pay-roll, who trades with L. Payne from this date will be discharged. Notify all in your department.

Like orders were issued to other heads of depart-ment of work in said company. He then avers he was brought into disrepute and greatly damaged—his business ruined.

The second count alleges that the defendants wan-tonly and maliciously undertook by means of threats, intimidation, slander, etc., to oppress, injure and damage plaintiff in his business, and threatened to discharge any employe of said road who should trade with plain-tiff, so that this being generally circulated, not only the employes were debarred from trading with him, but he was brought into reproach, disrepute and sus-picion, and lost his other trade and customers.

I assume that these two counts fairly aver that defendants conspired to injure the trade and business of plaintiff, by an order to the employes of the rail-road company, issued by the party who had the au-thority to enforce it, that any employe who should thereafter trade with plaintiff—that is patronize him in his business—should be discharged from the employ-ment of the company, and that this was done mali-ciously in the legal sense of that term (if it was un-lawful), because a wrongful act, or an act done to the injury of another, without any legal excuse or justification.

In this view the particular motive of the party, so

34—VOL. 13.

far as it was prompted by personal ill-will, would not be important, except in aggravation of damages, or showing the evil purpose of the act, or in giving punitive damages, should a jury deem it a proper case for punishment on all the facts.

The whole case turns probably on the question as to whether such a conspiracy, carried into effect by the issuance of the order, is the exercise of a lawful right, or is violation of law. I shall consider it in this aspect of it. I think the soundest principles of law ·well settled, and never questioned at this day, as well as the demands of public policy for this country, all things considered, demand that the facts charged shall be the basis of an action and recovery, unless defendants shall show something that shall justify their conduct and authorize the act, more than a mere will to do it. What might justify such conduct will be noticed before concluding.

It is true this case is one of first impression in our State, and we have no precedent precisely covering the facts to guide us. It might even be conceded, that the precise principle involved had never been adjudicated by our courts, and still a remedy might well be found growing out of the analogies of our law, taking other principles that are settled as the basis on which the rule should be formulated, and its correctness reasoned out and indicated.

We might even go further and say if the exigences of our advancing civilization demanded it, a new principle might be formulated to meet that demand, and this principle embodied in the well established forms

of remedy found in our system of remedial jurisprudence. It is as much a part of the common law, that it has growth and expansive power to meet the wants of an advancing and necessarily complex system of civilization, as that precedent shall have its due influence in settling what that law is at any period of that growth. Both principles have their legitimate spheres of operation, and are equally legitimate, when properly brought into play and judiciously used by enlightened courts. In no other way can that law be conceived to grow, and that growth is one of its most striking historic elements, can easily be seen by seeing what it was in the pages of Bracton, or even our more modern legal classic, Blackstone, and what we find it to-day, as we administer it. I need but say it will be found, that almost all, at least seventh-tenths of what we administer every day, was unknown in the time of Blackstone, and undreamed of by that great master of the common law, as it was in his day. "The process of growth," says Judge Cooley in his work on Torts, page 12, has been something like the following: "Every principle declared by a court in giving judgment is supposed to be a principle more or less general in its application, and which is applied under the facts of the case, because, in the opinion court, the facts bring the case within the principle. The case is not the measure of the principle, it does not limit and confine it within the exact facts, but it furnishes an illustration of the principle which might still have been applied, had some of the facts been different. But cases are seldom exactly alike in their

facts; they are, on the contrary, infinite in their diversities, and as numerous controversies on differing facts are found within the reach of the same general principle, the principle seems to expand, and does actually become more comprehensive, though so steadily and insensibly under legitimate judicial treatment, that for the time the expansion passes unobserved." So much for growth in this way.

"But," he adds, "new and peculiar cases must arise from time to time for which the courts must find the growing principle, and these may either be referred to some principle previously declared, or to some one which now for the first time there is occasion to apply."

If the present case can be ranged under either one of these categories, it will find a legitimate place in the jurisprudence of our State. I assume it may be properly solved by a sound application of already established principles, and shall attempt to show that they solve it by sustaining the right of the plaintiff in what he has averred in his declaration (the case standing on demurrer to a recovery), *prima facie* at least, and this is all that is necessary in the present aspect of the case.

It is axiomatic in our law, that there is no wrong without a remedy. I concede this necessarily means no legal wrong, therefore the question is whether there is a legal wrong in this case, if so the remedy follows as a matter of course. I may further concede frankly, that it is a self-evident proposition, that where a party has the legal right to do a thing, the *motive*

Payne v. Railroad Company.

with which he may assert his right, will not give a right of action, even where malice prompted the act: Wait's Act. & Def., vol. 1, 35, 36, and cases cited.

Is a legal wrong averred in this case? It is ingeniously and most ably argued, that none has been done, and cases cited in support of the view decided by various courts, in which with more or less directness, it has been so adjudged. With proper respect for these courts, I am compelled to differ with them, and proceed to give my reasons.

The sound principle, I think, is stated by Mr. Addison—a writer of accredited reputation—in his work on Torts, page 20: "Injuries to property, *indirectly* brought about by *menaces*, false representation or fraud, create as valid a cause of action as any direct injury from force or trespass. Thus if the plaintiff's tenants have been driven away from their holdings by the menaces of the defendant, damages are recoverable for the wrong done." So in a note to this by an American Editor, it is said, "that preventing a person from trading with another, by posting placards near his place of business calculated to bring him into contempt and injure his business, or issuing circulars and posting them near a person's work-shop, the legitimate and natural effect of which is to cause his workmen to leave his employ," are actionable by the party injured. For this is cited *Gilbert* v. *Mickle*, 4 Sand. Ch., (N. Y.), 357, and *Springhead Spinning Company* v. *Riley*, Law R., 6th Eq. Cases, 537.

Let us apply these principles to the case in hand. It is seen that they involve no element of contract

as between the party suing, not · even in the case of
the landlord whose tenants have been driven off by
menaces, nor privity of contract. But the injury was
simply a pecuniary one to him by loss of profits from
his land by reason of · the absence of his tenants.
That case has precisely the same essential elements in
it that this has. It was an injury resulting to a
third party by operating upon another, or threatening
such wrong. This is the same in principle. The
menace or threat in the order issued is a wrong done
to the freedom of the employe to buy where he
chooses or may find it to his interest to buy. The
tenant in that case may have had no right of action
by reason of the mere menaces, would not have had,
yet the landlord did have, because he was . pecuniarily
injured by the act, though the tenant may not have
been. The case of *Gilbert* v. *Mickle*, is precisely in
point, where persons were prevented from trading with
another, by placards calculated to bring him into con-
tempt and thus his business injured. And so the
English case of circulars posted up, the legitimate
effect of which was to cause his workmen to leave
him. So much for adjudication on the point. That
the ·issuance of an order by an agreement. between the
railroad corporation, and its officer having an authority
to discharge—threatening discharge from employment if
the employe should buy from a party in business,
would be more effective, and a more direct means to
effect the end designed, than a placard or circular ad-
dressed to or read by parties over whom the parties
had no control whatever, need not be argued. We

should have to shut our eyes to the truth of the case to doubt on such a question. Let us see if this view is not sustained by the sound analogies furnished from other well established principles. It is well established that an action does not lie against a person for causing an injury by an accident unavoidable: Wait's Act. & Def., vol. 1, 160, and cases cited. But if any blame attaches to the party, by reason of the *negligent* performance of the act, then he is responsible: *Id.,* vol. 6, 119. One who, without intention inflicts personal injury, will not be liable, if he exercised the *prudent* care and *diligence* demanded by the circumstances: *Id.,* and authorities cited.

If a party is held responsible in damages, where he is doing an act itself lawful, simply because of want of due care which was prudent to exercise under the circumstances, and for this negligence is held to answer in damages for an act beyond his intention, and it may be one, the result of which he would have never voluntarily sought. Much more ought he to be held liable, where the act is one deliberately purposed and the result deliberately sought, and the means most effective and best calculated to produce the result deliberately adopted and persistently carried out. It will be said the injury is the result of negligence and this was unlawful only because it produced injury, as in the case of a man shooting arrows at a mark, and one glanced and struck another, he was held responsible in damages, although the act was lawful in itself, even as far back as the year books See Wait, vol. 1, 160.

So here is an act threatened and done which of
itself might be lawful, that is to discharge the em-
ploye, but when you add a conspiracy to do so in
all cases, if the parties trade with another and thus
injure him, and to do this with that purpose, here is
an act done directly with the evil intent that injures
another, and much more should the party respond in
damages for it.  Whenever there is an act done with
the purpose to injure another, and not simply in the
exercise of one's legal right and that injury is pro-
duced, and the means used naturally tend to the end
designed, then for that injury the party should be
held responsible, even though the act with no such
purpose, and no such result might be lawful.    Thus,
if A sets fire to his own fallow ground, as he may
lawfully do, which communicates to and fires the wood-
land of his neighbor, no action lies unless there was
some negligence or misconduct on the part of him or
his servants: 8 John., 422, and other cases; Wait,
vol. 1, 161.    Numerous like cases are found, all in-
volving the same principle.

But if the party is held responsible for want of
due care and precaution to prevent injury to his neigh-
bor, when he exercises a clear legal right, how can it
be, that if without any care, on the contrary, with the
well conceived plan, and of deliberate purpose he does
an act, which might be lawful of itself, solely for the
end of doing that injury?

Judge Cooley in his work on Torts, page 693, in
treating of the effect of motive, in doing an act which
the party had the right of itself to do, says: "Sup-

pose, for instance, a man should make an excavation
on his own ground for the mere purpose of annoying
his neighbor, and compelling him to be at expense of
supports for his building, would not his motive demand
of him the observance of more than ordinary care to
avoid injury?   Suppose he were to build a fire on his
own premises for the sole purpose of incommoding a
neighbor with smoke and dust, and the fire should
spread to the neighbor's premises, the motive itself
strengthens greatly any other evidence that might exist
of the want of proper care to prevent the fire spread-
ing?"   The point, he adds, "is not without in-
terest, and it would seem that there must certainly be
some difference between the man who proposes to keep
within the limits of the legal right, and also to cause
no annoyance and the man who proposes to cause what
annoyance he may find possible without exceeding
these limits."

I answer, there should be such a difference, but it
is not found in requiring more care in the case of
the act done with the bad motive, for in either case
due care must be taken, and if any negligence occurs
the party is liable, as held by this court at this term
in the case of *Sallie* v. *East Tennessee, Virginia & Geor-
gia Railroad Company*, and that where the injury was
done to another by the use of one's own property,
he was bound to show that all precautions were taken
to prevent it.   The care in such a case must be such
as is reasonably adapted to prevent the injury, and
the want of this would make the party liable regard-
less of motive.   But now suppose the act is done,

say the fire kindled, not to annoy simply, but with the purpose the neighbor's property *shall* be destroyed by it, and it is so placed, as that naturally it will be likely to reach his buildings; no one ever doubted the party would be liable for this purposed wrong. Suppose the excavation is made to annoy, and purposely so planned, that it shall from the nature of the soil, undermine and destroy his neighbor's building, would not this be beyond, and a much stronger case of liability, than mere neglect of proper precautions? Suppose in the case of the *Coal Chutes* it had appeared that the company had no need to put them near the party's dwelling, but had purposely put them there to destroy its value, would it not be much more liable for the injury than if it had simply failed to use the most effective means to prevent it? I think it would, both in law and sound morality, as well as a true public policy.

It is settled by a large weight of authority, that a man may become a trespasser by the improper use of his own premises or property, as by excavating his soil so as to divert the natural flow of a stream from the adjoining owner: *VanHœsen* v. *Coventry*, 10 Barb., 518. Or to displace a party wall: 6 Duer., 17. Or to undermine the natural lateral or subjacent support of the land of his neighbor: 1 Law & Eq. R., 241. In all these cases the act itself is lawful, but when it is so done as to injure a neighbor it becomes actionable.

Now, in all these cases the law gives a remedy where an injury is done to another, simply because a

party, though exercising a legal right, and using his own, has neglected proper precautions to prevent an injury to his neighbor; much more should it give a remedy, where the injury was purposed, and the use or exercise of his own right is only a cover to injure his neighbor. The exercise of no legal right *per se* will in the slightest degree be infringed. The party would only be required to exercise his legal rights for proper and justifiable purposes, and wherever these were shown there would be no liability, but whenever the exercise of the right was solely for the purpose of injury to another, and such injury followed, he should respond in damages for that which he had purposely inflicted. He cannot complain at the purposed result of his own act being visited upon him.

If, however, he could show it was exercised for justifiable cause as in this case, because the party supplied liquor to intoxication or impure food, or the like to his employes, by which their efficiency was lessened and he injured, then such an order would be justified.

This question is discussed with much ability in an opinion by Chief Justice Appleton, of the Supreme Court of Maine, A. R., 373, *Haywood* v. *Tillson.* It was there held that no action lay by the owner of a house against one who maliciously refuses to employ any tenant of such house and thus prevents its renting. This case is different or stronger than that, as is shown or averred that the purpose of the order is to injure the plaintiff's business. In that case no such purpose was shown. There was a mere threat in that case, that no man who was a tenant of plain-

tiff's house should work for defendant, The party was under no obligation to employ such occupant, nor had any one been turned out of employment on account of occupying the house. It was only a threat, and nothing more, and there were other reasons justifying the threat.

I concede the argument of the opinion is in support of the view of defendants in this case, but in so far as it does support it, I do not think it sound. The plaintiff had the property in the goodwill of his business, which consisted largely in the location of his house near the work shops of defendant, it may have been purchased by reason of this advantage. That location gave him the right unrestrained to all the natural trade advantages incident to that locality. The location with these advantages would render his business far more valuable, and the property owned by him proportionately valuable. This value would consist largely in convenience for obtaining the custom of the employes of defendants. That they are numerous is averred, and the effect of the order calculated and certainly effective to prevent his getting this custom, and thereby destroy much of his trade theretofore had. In addition it is seen that the withdrawal of so many customers would naturally tend to excite suspicion against plaintiff's character as a tradesman, and thus his injury be increased. All this, taking the averments of the declaration were results that might be foreseen, and were the natural result of the act of defendants, and they should be held responsible as others for such results if proven, and

no justifiable reason or excuse given for the order. On· this question, as I have shown, there may be found both authority, and as I think, sound legal analogy in favor of the propositions maintained. There are authorities and plausible reasonings, it is conceded, on the other side. The question is which is the better rule, and which will best serve the ends of a sound public policy?

The rule I have maintained· is in strict accord with a maxim of the law, so well founded in reason as to need no argument or authority to support it, that is, that a man must so use his own as not to do an injury to others. That this means he shall so enjoy his legal rights, as not to do a wrong to the legal rights of another, I freely concede. But here is a use of his legal right to discharge employes, for the direct purpose and with no other, and for no other reason except to prevent their trading with a party legitimately entitled by his location and the character of his business to such trade. Here is the use of a legal right, to deprive the other of that which is his legal right, to-wit, the property he has in the good-will of his business, which consists in his business character for integrity and fair dealing, his convenience of location to his customers, the character of goods he sells, and fairness of price for which they are sold, and the like. All these make up as elements of that property now well recognized in our law as the "good-will" of a business. For a party who has the power, to use that power, to destroy or injure the value of this property, in the exercise of a right, not for any

reason of advantage to himself, but solely to injure another, ought not to be permitted by an enlightened system of jurisprudence in this country.

It is argued that a man ought to have the right to say where his employes shall trade. I do not recognize any such right. A father may well control his family in this, but an employer ought to have no such right conceded to him. In the case in hand and like cases under the rule we have maintained, the party may always show by way of defense that he has had reasons for what he has done; that the trader was unworthy of patronage; that he debauched the employe, or sold, for instance, unsound food, or any other cause, that affected his employes' usefulness to him, or justified the withdrawal of custom from him. This is not in any way to interfere with the legal right to discharge an employe for good cause, or without any reason assigned if the contract justifies it, but only that he shall not do this solely for the purpose of injury to another, or hold the threat over the employe *in terrorem* to fetter the freedom of the employe, and for the purpose of injuring an obnoxious party.

Such conduct is not justifiable in morals, and ought not to be in law, and when the injury is done as averred in this case the party should respond in damages. The principle will not interfere with any proper use of the legal rights of the employer, an improper and injurious use is all it forbids.

In view of the immense development and large aggregations of capital in this favored country—a capital to be developed and aggregated within the life of

the present generation more than a hundred fold—giving the command of immense numbers of employes, by such means as we have before us in this case, it is the demand of a sound public policy, for the future more especially, as well as now, that the use of this power should be restrained within legitimate boundaries. Take for instance the larger manufacturing establishments of the country—of which we will in time have our full share, when thousands upon thousands of hard-working operatives will be employed. It will be to their interest to have free competition in the purchase of supplies for their wants, and its beneficial influences in keeping prices at the normal standard. The merchant and groceryman, and other traders should be untrammelled to furnish these, and the employes untrammelled in the exercise of his right to purchase where his interest will best be subserved. If, however, these masters of aggregated capital can use their power over their employes as in this case, all other traders except such as they choose to permit will be driven away or crushed out, and their capital probably alone have a monopoly to furnish his employes at his own rates freed from competition. The result is that capital may crush legitimate trade, and thus cripple the general property of the country and the employe be subject to its grinding exactions at will.

The principle of the majority opinion will justify employers, at any rate allow them to require employes to trade where they may demand, to vote as they may require, or do anything not strictly criminal that employer may dictate, or feel the wrath of employer by

·dismissal from service. Employment is the means of sustaining life to himself and family to the employe, and so he is morally though not legally compelled to submit. ·Capital may thus not only find its own legitimate ·employment, but may control the employment of others to an extent that in time may sap the foundations of our free institutions. Perfect freedom in all legitimate uses is due to capital, and should be zealously enforced but public policy and all the best interests of society ·demands it shall be restrained within legitimate bounda-·ries, and any channel by which it may escape or over-leap these boundaries, should· be carefully but judi-·ciously guarded. For its legitimate uses I have perfect respect, against its illegitimate use I feel· bound, for the best interests. both of capital and labor, to protest.

In view of the legal reasons and authorities given, and these elements of a sound public policy, I think the rules I have maintained and authorities sustaining them, are the better based in all the elements of ·sound rules of action that will best subserve the public interest, and at the same time do violence to no right that is exercised with a commendable or just motive, for a commendable and· proper end, will only restrain wrong and prevent conduct that no sound judgment will approve as bassd· on a sound morality.

I therefore think the action *prima facie* maintain-.able, and the demurrer should be overruled.