BUDDY LEE ATTRACTIONS, )
INC., )
 )        Appeal No.
   Plaintiff/Appellee, )        01-A-01-9804-CH-00185
 )
v. )        Davidson Chancery
 )        No. 94C-2578
WILLIAM MORRIS AGENCY, )
INC., and JOSEPH E. HARRIS, )
 )
   Defendants/Appellants. )

**FILED**

**September 21, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

## COURT OF APPEALS OF TENNESSEE

### APPEAL FROM THE CHANCERY COURT FOR DAVIDSON COUNTY,
### AT NASHVILLE, TENNESSEE

### THE HONORABLE IRVIN H. KILCREASE, JR., CHANCELLOR

SAMUEL D. LIPSHIE
SCOTT K. HAYNES
LUTHER WRIGHT, JR.
Boult, Cummings, Conners & Berry
414 Union Street, Suite 1600
P. O. Box 198062
Nashville, Tennessee 37219
     ATTORNEYS FOR PLAINTIFF/APPELLEE

JAY S. BOWEN
TIMOTHY L. WARNOCK
GREGORY S. REYNOLDS
Bowen Riley Warnock & Jacobson
1906 West End Avenue
Nashville, Tennessee 37203
     ATTORNEYS FOR DEFENDANTS/APPELLANTS

### REVERSED AND REMANDED

WILLIAM B. CAIN, JUDGE

Defendant, William Morris Agency, Inc., appeals an adverse jury verdict in the amount of $250,000.00, trebled by the trial judge under Tennessee Code Annotated section 47-50-109. This defendant also appeals a partial summary judgment order granted to plaintiff prior to the three week jury trial.

I.    FACTS

Both plaintiff Buddy Lee Attractions, Inc. and defendant William Morris Agency, Inc. were at all times material in this case, competing "booking agencies" representing various performing artists in the music industry. Defendant, Joe Harris, was an experienced booking agent who was employed on August 18, 1987 by Buddy Lee Attractions, Inc. On this date both Buddy Lee and Joe Harris executed a document entitled "Conditions of Employment" which stated in pertinent part:

> 5. In the event of cessation of Employee's employment, Employee shall not, during the period of two years immediately following cessation of Employee's employment, in any capacity represent any artist or act who or which was under contract to or in any way represented by Buddy Lee Attractions, Inc. during the one-year period immediately preceding the date of cessation of Employee's employment.

While employed by Buddy Lee, Joe Harris was "responsible agent" for several artists including Trisha Yearwood, Garth Brooks and Mark Chestnut.

On August 18, 1993, Joe Harris left Buddy Lee's employ to work for the William Morris Agency. Two days later Trisha Yearwood terminated her relationship with Buddy Lee, joining William Morris' roster of represented artists; William Morris appointed Joe Harris as Ms. Yearwood's responsible agent for booking.

Buddy Lee Attractions, Inc., filed suit on Sep. 16, 1993, alleging, inter alia, breach of contract by Joe Harris and common law and statutory intentional contractual interference on the part of William Morris. In support of these allegations Buddy Lee asserted in pertinent part that:

## COUNT II
* * *

36. At all times relevant hereto, William Morris Agency had knowledge that there existed an employment agreement between Harris and Buddy Lee Attractions in which Harris agreed not to represent for a period of two (2) years after cessation of his employment with Buddy Lee Attractions in any capacity "any artist or act who or which was under contract to or in any way represented by Buddy Lee Attractions, Inc., during the one year period immediately preceding the date of cessation of [Harris'] employment."

37. In the alternative, William Morris Agency acted with reckless disregard of the rights of Buddy Lee Attractions by purposefully failing to make sufficient or reasonable inquiry regarding any post-employment restrictions on Harris' business activities and the existence of the Restrictive Covenant.

38. Pursuant to the scheme of Harris and William Morris Agency to persuade artists represented by Buddy Lee Attractions at any time in the preceding year to terminate Buddy Lee Attractions as their talent agency and engage William Morris Agency in that capacity, as more fully described hereinabove, William Morris Agency intended to induce Harris to breach the Agreement.

39. William Morris Agency, through its efforts to represent the artists either currently or formerly represented by Buddy Lee Attractions, acted maliciously and in willful violation of Buddy Lee Attractions' known rights.

40. The acts of Harris as described herein and in furtherance of his and William Morris Agency's scheme constitute a breach of the Agreement.

41. The acts of William Morris Agency in inducing Harris to breach his Agreement with Buddy Lee Attractions proximately caused Harris' breach of the Agreements.

42. As a direct and proximate result of the breach of the Agreement, Buddy Lee Attractions has been damaged in an amount to be determined at the trial of this action.

43. Pursuant to T.C.A. § 47-50-109, William Morris Agency is liable in treble the amount of damages resulting from or incident to the breach of the Agreement.

## COUNT III
* * *

45. Plaintiff alleges that William Morris Agency is liable

under the common law tort of inducement of breach of contract by violating the Restrictive Covenant for (1) all damages to be determined at the trial in this matter resulting from and incident to Harris' breach of the Agreement and (2) punitive damages in an amount sufficient to punish William Morris Agency and deter it and others from engaging in similar conduct in the future.

In defense of this complaint, both Joe Harris and William Morris Agency, Inc., rely on an alleged 1991 agreement between Joe Harris and Buddy Lee Attractions, Inc., which purportedly superseded the 1987 "Conditions of Employment" contract, and contained among other provisions the following:

17. Other Contracts Replaced: As of the effective date of this Agreement, this Agreement supersedes, replaces, and cancels all previous contracts, agreements, and/or arrangements of any kind or nature whatsoever, whether oral or written, that may exist or may have existed between Employer and Employee on or before the date of execution of this Agreement.

Since the alleged 1991 agreement contained none of the post-employment restrictions appearing in the 1987 agreement, defendants assert that neither of them are in any way liable to Buddy Lee Attractions, Inc. because there has been neither breach of contract by Joe Harris nor inducement to breach on the part of William Morris Agency, Inc.

On August 7, 1995, the trial court entered an order holding:

The Court finds that there is no genuine issue of material fact in dispute with respect to the validity of the 1987 employment agreement and that it is enforceable in accordance with its terms as a matter of law. The Court further finds that the 1987 contract is the operative contract between defendant Harris and Buddy Lee Attractions and that there are no valid defenses to the 1987 contract. Buddy Lee Attractions is, therefore, entitled to summary judgment as a matter of law as to the validity and effect of the 1987 employment agreement between Buddy Lee Attractions and defendant Harris.

Following a three week jury trial, the trial court, on September 5, 1997, submitted the case to a jury under a verdict form stating, in part, as follows:

A.     BREACH OF CONTRACT
The Court instructs you that the 1987 Conditions of Employment between Buddy Lee Attractions and Joe Harris was a valid contract and was operative during the relevant periods of time

4

at issue in this action. The Court further instructs that Joe Harris breached the 1987 Conditions of Employment when he represented Trisha Yearwood during his employ at William Morris Agency. These two elements of Buddy Lee Attractions' claim against the Estate of Joe Harris have been proven, and you, the jury, must not consider these elements.

It is obvious that if the trial court erred in holding the 1987 contract applicable as a matter of law, rather than submitting to the jury for factual determination, whether the 1987 agreement or the 1991 agreement governed the relationship between the parties, the jury verdict can not stand.

We have determined that the question of which contract controls is a question of fact for the jury and that the trial court erred in granting partial summary judgment and in charging the jury as set forth above.

The first issue on appeal, as stated by William Morris Agency, Inc., is:

I. Whether the lower court erred in granting summary judgment to Buddy Lee on the issue of whether the 1991 agreement superseded the 1987 agreement.

At the time of the jury trial all parties labored under the handicap caused by the death of defendant Joe Harris. In response to the motion for partial summary judgment, defendant Joe Harris filed an extensive affidavit on September 23, 1993. On August 7, 1995, the trial court granted partial summary judgment, holding as a matter of law that the 1987 contract was controlling. On January 20, 1996, Joe Harris died, and at trial his estate was unrepresented.

While the intervening death of Joe Harris may have presented serious evidentiary problems for the defendants at trial, they labored under no such handicap at the time of the partial summary judgment in August 1995. His affidavit conforms to Rule 56.06 of the Tennessee Rules of Civil Procedure and it, along with all other evidence in the record at the time partial summary judgment was granted, must be viewed in the light most favorable to the non-moving party, and all reasonable inferences to be drawn from such evidence must be construed in favor of the non-moving party. *Byrd v. Hall,* 847 S.W.2d 208, 210 (Tenn. 1993). If, after such consideration, a genuine issue of fact remains for trial,

5

or if there is doubt as to whether or not such genuine issue remains for trial, the summary judgment must be overruled. *Evco v. Ross*, 528 S.W.2d 20, 24-25 (Tenn. 1975).

Because the granting of summary judgment involves a question of law, the decision of the trial court is not entitled to a presumption of correctness. *Gonzales v. Alman Constr. Co.*, 857 S.W.2d 42, 44 (Tenn. App. 1993).

The affidavit of Joe Harris of September 23, 1993, asserted in part:

8. Buddy Lee called one day and I agreed to return to Buddy Lee Attractions, bringing with me artists Razzy Bailey, Mel McDaniel, Helen Cornelius, Joe Stampley, and some others. I had no written employment agreement, but I did have a written agreement for my commissions on Mel McDaniel and I did sign the Conditions of Employment.

9. While working at Buddy Lee Attractions, I received a call from an old friend and well-known producer Jerry Kennedy. At the time he was producing Mel McDaniel, among others. Jerry Kennedy told me about a new artist named Garth Brooks and suggested that I call his manager, Bob Doyle. I called Bob and he and Garth came to see me. They brought a tape of Garth's, but Garth said that he would like to play some songs for me as well. I listened to one song and I decided I wanted to book Garth Brooks. I signed Garth to a contract with the agency in 1988 and have been his booking agent ever since.

10. Garth did not have a recording contract with a major label at the time. I called Jim Fogelsong at Capitol Records and suggested that he have someone listen to Garth. It is my understanding that Jim Fogelsong sent Lynn Schultz, then of Capitol Records, to hear Garth at a writer's night at the Bluebird Café and that this led to Garth's first major-label contract.

11. In the early part of 1991 Garth came to see me. he discussed generally his desire that I remain his booking agent and I assured him that I would. He said that he wanted to make sure that I was treated right and I told him that I was being paid a guaranteed weekly salary plus a one percent commission on the dates that I booked. Some time thereafter, Tony Conway told me that Rusty Jones, Bob Doyle, and Kerry O'Neil had come to see him about renegotiating Garth's contract and that Garth wanted to pay me directly a commission of five percent on the dates that I booked for him. This was the first time that I had heard any of the terms of the proposed amendment to Garth's contract with the agency.

12. As the negotiations for the amendment proceeded, I talked several times with Garth's attorney, Rusty Jones. I became aware that I would need to have my own contract with Buddy Lee Attractions to ensure that Buddy Lee Attractions would be

contractually obligated to me and to make sure that my five-percent commission would not be subject to a claim by the agency. I asked Rusty if he could prepare the contract for me, but he said that because he was Garth's lawyer, it would be inappropriate for him to act for me and that I should have my regular attorney, Jim Harris, draft the agreement for me.

13.     When Garth's amendment was completed in April of 1991, I was asked to sign it and I did. I then contacted Jim Harris and asked him to draft a separate contract between me and Buddy Lee Attractions which would be consistent with and would protect my interests in Garth's amendment. I told Tony Conway what I wanted as the terms of my new contract and I advised my attorney, Jim Harris, to prepare the contract.

14.     Jim Harris drafted a contract which ensured that I was entitled to receive the five-percent commission directly from Garth, specified my right to act as a consultant and advisor to other booking agencies, and terminated all other existing agreements between me and Buddy Lee Attractions. Each of these provisions was new and different from the terms of the oral agreement that I had with Buddy Lee Attractions. I wanted to make sure that the new contract terminated all other existing agreements because Garth had told me that he wanted me to be his booking agent even if he left the agency. I knew that his amendment gave him the right to leave at any time, and the 1987 Conditions of Employment, if enforceable against me, could have restricted my right to represent Garth. A true copy of the agreement prepared by Jim Harris is attached to this my affidavit and is made a part hereof.

15.     In addition, the contract confirmed in writing my guaranteed salary to $600.00 per week, my three weeks vacation, my insurance and sick leave benefits, and my commission percentage for artists other than Garth Brooks, which had been a part of my oral agreement.

16.     Jim Harris completed my contract with Buddy Lee Attractions in early June of 1991. It was to be effective on the first day of June, 1991, and was to run for a term of two years. When Jim Harris delivered the finished version of the contract to me, I signed it, took it in to Tony Conway, and left it with him. Shortly thereafter, Tony came to me and said that he could not take it to Buddy Lee right then because if he took it to him now he would cry and he was not in good health. He said he did not want anybody even to call Buddy because of the state of Buddy's health. He kept the agreement and did not return it to me. He did not say that either he or Buddy Lee had any objection to the contract. I left with the impression that Tony would discuss the contract [with] Buddy Lee and that Tony would sign the contract later.

17.     I continued my work at Buddy Lee Attractions under the terms of my new contract and Buddy Lee Attractions honored all of its provisions. I received my guaranteed salary of $600.00 per week, I took three weeks vacation, and I gave advice to other agencies, particularly with respect to booking opening acts, but I received no

7

compensation for this advice. My thought was that by giving proper advice to other agencies about dates for opening acts, I was helping Buddy Lee Attractions put together a more attractive package for its own acts. I began to receive my five-percent commission directly from Garth Brooks.

18. Because Buddy Lee Attractions was honoring the terms of the new contract, I did not think much about Buddy Lee's not returning a signed copy of the contract. Instead, I continued to work throughout and past the expiration of the term of the new contract. Neither Buddy Lee nor Tony Conway ever returned a signed copy of the contract to me. But, at no time prior to my resignation did Buddy Lee, Tony Conway or anyone else ever indicate to me any disagreement with the terms of the new contract. And, at no time prior to my resignation did Buddy Lee or Tony ever indicate to me that the new contract was not in full force and effect.

## II. PARTIAL SUMMARY JUDGMENT AS TO THE EFFECT OF THE 1987 CONTRACT.

The lengthy and detailed "Employment Agreement" bearing the date of June 1991 was never signed by anyone representing Buddy Lee. It is likewise true that Buddy Lee vehemently denies that the 1991 purported agreement was ever accepted by Buddy Lee and asserts that the parties continued to operate solely under the "Conditions of Employment" document of August 18, 1987. Indeed, by affidavit of September 27, 1993, Tony Conway of Buddy Lee Attractions, Inc. asserts that he could not remember ever receiving the original or a copy of the alleged 1991 agreement prior to August 26, 1993, after Joe Harris had resigned from Buddy Lee Attractions, Inc. He further denied that he had ever discussed such an agreement with Joe Harris.[1]

Faced with this swearing contest between Joe Harris and Tony Conway, we next look to the conduct of the parties subsequent to June 1991.

"It is a general principle of the law of contracts that, while an assent to an offer is a requisite to the formation of an agreement, yet such assent is a condition of the mind, and may be either express or evidenced by circumstances from which the assent may be inferred." *Cole-McIntyre-Norfleet Co. v. Holloway*, 141 Tenn.

---

[1]Four years later in rebuttal, Mr. Conway testified:

Q. What did you do when Mr. Joe Harris presented that document to you?

A. He handed it to me. I skimmed through it like this (indicating), and handed it back to him. I said, there is no reason to do a contract, Joe, you already have one.

679, 214 S.W. 817, 818 (1919); *see also Province v. Mitchell*, 44 Tenn. App. 115, 124, 312 S.W.2d 861, 865 (Tenn. App. 1958) and *Yarbrough v. Stiles*, 717 S.W.2d 886, 888 (Tenn. Ct. App. 1986).

The "Conditions of Employment" document of August 18, 1987 provided, in part, as follows: "7. All commission checks from artists shall be made payable to Buddy Lee Attractions, Inc."

The alleged "Employment Agreement" of June 1991 provided in part as to the commission income of Joe Harris:

> 3.3    An amount equivalent to 5% (five percent) of the total gross compensation paid to the artist known as Garth Brooks for each personal performance engagement or personal appearance engagement which is performed by Garth Brooks and for which employer is entitled to receive a commission.
> 3.4    Notwithstanding anything to the contrary appearing elsewhere in this agreement, Garth Brooks is authorized to pay the aforesaid percentage to employee directly for each personal performance engagement or personal appearance engagement which is performed by Garth Brooks and for which employer is entitled to receive a commission.

The artist Garth Brooks is not mentioned in the 1987 agreement and the direct payment provision from Garth Brooks to Joe Harris is inconsistent with the 1987 agreement but altogether consistent with the 1991 agreement.

It is undisputed that the general compensation paid to Joe Harris was the amount set forth in the 1991 agreement and not the amount set forth in the 1987 agreement. His salary under the 1987 agreement was $500.00 per week. His salary under the 1991 agreement was $600.00 per week. It is undisputed that his salary was paid in the amount set forth in the 1991 agreement.

From the affidavit of Joe Harris and the actions of the parties subsequent to June 1991, it may be inferred that Buddy Lee had assented to the 1991 agreement. It might also be inferred that the conduct of the parties was consistent with the

1987 agreement and that the change in base salary was coincidental to the provisions of the 1991 contract. It may likewise be inferred that the 5% commission directly paid to Joe Harris was not due to assent by Buddy Lee to the 1991 agreement but rather in conformity with the insistence of Garth Brooks in his own contract with Buddy Lee. On summary judgment motion, however, such inferences address themselves to the trier of fact, not the trier of law. *See Byrd v. Hall*, 847 S.W.2d 208, 216 (Tenn. 1993).

"When a contract between two parties which is contemplated to be signed by both is reduced to writing and signed by only one of them, but accepted by the other, it becomes in contemplation of the law, a written binding contract on both." *Carter v. Richards*, No. 116, 1990 WL 209330, at * 3 (Tenn. Ct. App. Dec. 12, 1990); *Southern Motor Car Co. v. Talliaferro*, 14 Tenn. App. 276, 280 (1931).

The evidence offered by the defendants is sufficient under the *Evco v. Ross* standards to present a genuine issue of material fact as to whether or not the 1991 agreement superseded the 1987 agreement, thus freeing the defendants from the non-compete provisions of the 1987 agreement. The trial court erred in its grant of partial summary judgment on this issue and such error is fatal to the ensuing jury verdict.

III.    JIM HARRIS' TESTIMONY

In conjunction with William Morris' motion for summary judgment, and, apparently in opposition to Buddy Lee's motion for summary judgment regarding the applicability of the 1987 contract, Jim Harris, attorney for Joe Harris, filed a motion to be relieved as counsel on July 20, 1995. This motion was couched in terms of protection for client Harris. The motion states:

> In its response to William Morris' motion for summary judgment, Buddy Lee denied the existence of the 1991 contract and accused Defendant Harris of knowingly violating the 1987 restrictive covenant and William Morris of maliciously and intentionally inducing Defendant Harris to breach the restrictive covenant. It now appears that Defendant Harris' intentions, state of mind, and credibility could be at issue with respect to the circumstances of his termination of his employment from Buddy Lee Attractions, Inc. and his subsequent employment by William Morris.

DR 5-102(A) of the Code of Professional Responsibility states that, "If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he ... ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial ... except that he may continue the representation and he ... may testify in the circumstances enumerated on DR 5-101 (B)(1) through (4)." Counsel can no longer say with certainty that his potential testimony on behalf of Defendant Harris is subject to the exceptions provided in DR 5-101(1) or (2). Therefore, DR 5-102(A) leaves counsel with no choice but to withdraw from participation on behalf of Defendant Harris in the trial of this case.

From this Court's gleaning of the unusually duplicative record, this appears to be the first time Jim Harris moved to withdraw as counsel for Joe Harris. The above motion is cited in the trial court's order of August 7, 1995, granting Buddy Lee's summary judgment as to the validity of the 1987 contract among other issues. With regard to this motion, the court found:

4. James H. Harris, III, counsel for defendant Harris, seeks to withdraw as counsel of record for defendant Harris in this action. The Court is of the opinion that based on the record before the Court and the Court's familiarity with the record, any testimony given by James H. Harris, III, would be cumulative and uncontested. The Court further finds that any testimony sought to be given by James H. Harris, III, could easily be the subject matter of a stipulation between the parties. The Court thereby finds that it is not necessary for James H. Harris III, to be relieved as counsel of record for Defendant Harris in this action. Additionally, the Court finds that since any testimony to be given by James H. Harris, III would be cumulative and uncontested, James H. Harris, III should not be allowed to testify on behalf of his client, defendant Harris, or William Morris. In this regard, the Court finds that the prejudice to Buddy Lee Attractions far outweighs any probative value of allowing James H. Harris to testify in person versus some stipulation or other means of introducing the cumulative and uncontested evidence that would be the subject matter of such testimony.[2]

On the first trial date, apparently foreseeing summary judgment to his client's detriment concerning the 1987 contract, attorney Harris moved on behalf of client Harris to continue the action in Chancery Court pending results of arbitration. This motion was granted by the court below in an order entered

---

[2]It bears noting that the "stipulation" of which the court speaks was nothing of the sort. The substance of the proposed stipulation was completely contrary to the substance of the evidence proposed by Defendants below. Thus, no one would stipulate to the stipulation.

August 18, 1995.[3] The most complicating factor regarding the necessity and viability of James Harris as a witness occurred during the pendency of the resulting arbitration and appeal from that original order. On January 20, 1996, Joseph E. Harris, the lightning rod of this unfortunately lengthy litigation, the man who represented one of the most popular music acts of all time, died at the age of 57. With that passing went the only party besides Tony Conway of Buddy Lee Attractions and Jim Harris who had any first hand knowledge of the negotiations involving the alleged 1991 contract. Yet when attorney Harris moved the court to reconsider its 1995 order, that motion was rebuffed. Although the action of the court below on reconsideration is not memorialized by written order in the record before this Court, the transcript of the pre-trial proceedings of August 19, 1996, reads in pertinent part as follows:

> THE COURT:     Well, Mr. Harris can't go in and out of --
> MR. BOWEN:     No, sir.
> THE COURT:     -- of the trial.
> MR. BOWEN:     That's up to him. I don't believe he's planning to do that. I believe he's asked to be excused, and if that's the case, he's fair game as a witness.
> THE COURT:     No he's not fair game because he's going to be representing the Estate of Joe Harris, so it's not necessary for him to stay in the courtroom every day. That's his civil case. It's up to him if he wants to come in and out, but that doesn't relieve him of any involvement in the case, and I won't set my ruling aside. I'll stay with my ruling.
>
>                          * * *
>
> MR. HARRIS:     As Your Honor may recall, when the -- the question of my possible participation as a witness first came up, I moved the Court to be allowed to withdraw as counsel, and based on the ethical consideration which requires that, and that motion was denied, so I'm not withdrawn as counsel. However, I see no reason for my party to be here and participate in something that really has little to offer.
>
>                          * * *
>
> THE COURT:     I'm not going to permit Mr. Harris to withdraw from this case. If he wants to go in and out at different times, he is free to do so, but he's still an attorney of record for the Estate.

The next major discussion involving James Harris appears in the form of

---

[3]Said order of the Chancery court was vacated by order of this Court, Appeal No. 01-A-01-9511-CH-00512, in connection with the parties withdrawal of appeal from the original arbitration mandate.

an offer of proof. Although the 1991 agreement was discussed in the presence of the jury, Mr. Harris was never allowed to testify as to the circumstances surrounding the alleged 1991 agreement, as such testimony might bear on the intentions, state of mind and motives of Joe Harris or representatives of the William Morris Agency. The trial court's refusal to allow attorney Harris to testify was apparently grounded in Rule 403 of the Tennessee Rules of Evidence and in the fact that James Harris was an attorney for one of the parties involved in the case at bar.

Rule 403 provides for the exclusion of relevant evidence the probative value of which is outweighed by, *inter alia*, the danger of unfair prejudice. Tenn. R. Evid. 403. The original motion to withdraw filed by Attorney Harris was grounded in Disciplinary Rule 5-102. The application of Disciplinary Rule 5-102 is guided by Ethical Consideration 5-9, which provides as follows:

> EC 5-9. Occasionally a lawyer is called upon to decide in a particular case whether the lawyer will be a witness or an advocate. If a lawyer is both counsel and witness, the lawyer becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing the advocate's own credibility. The roles of an advocate and of a witness are inconsistent.

> Tenn. Sup. Ct. R. 8, EC 5-9.

It is clear that James Harris would be a fact witness in the trial below. At trial Buddy Lee was willing to allow Mr. Harris to read portions of his deposition.

Tennessee's application of Rule 403, parallels the application of the federal rule. *See State v. Banks,* 564 S.W.2d 947, 951 (Tenn. 1978). There is no question that to properly exclude relevant testimony, the trial court must find *unfair* prejudice. Even if one could say that the reasons for admitting James Harris' testimony were questionable, this court finds persuasive the Sixth Circuit's discussion in the case of *Doe v. Claiborne County:*

> ..."Unfair prejudice" means the *undue* tendency to suggest a decision based on improper considerations; it "does not mean the damage to

> a [party's] case that results from the legitimate probative force of the evidence." *United States v. Bonds,* 12 F.3d 540, 567 (6th Cir.1993) (internal quotation marks and citations omitted). Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and a careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 596, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469 (1993).

*Doe v. Claiborne County, Tenn.,* 103 F.3d 495, 515 (6th Cir. 1996).

Jim Harris' testimony regarding the 1991 contract was probative of the possible existence of an agreement between Buddy Lee and Harris, as well as the intent of Joe Harris and the William Morris representatives relative to tortious interference and inducement. This testimony goes to the very heart of the defendants' case and to disallow it deprives the defendants of fact testimony of probative value. The fact that it may damage the plaintiff's case involves the "legitimate force" of his testimony. It is not "unfair prejudice" under Rule 403. In this case cross examination of Jim Harris is available as with any other witness and "...[o]n retrial, upon introduction, the trial judge should give a carefully detailed limiting instruction advising the jury as to the use of the evidence." *Woodson v. Porter Brown Limestone Co.,* 916 S.W.2d 896, 908 (Tenn. 1996).

Appellee would suggest that such exclusion was suitable not only because of unfair prejudice, but also for the surprising nature of the motion to reconsider argued on the trial date. Since the case must be retried because of the erroneous grant of partial summary judgment, such surprise, if any, no longer exists.

## IV. TREBLE DAMAGES

The final issue on this appeal regards the trial court's actions concerning treble damages.[4]

The statute under which treble damages were sought, Tennessee Code

---

[4]Appellant William Morris raises several issues on appeal which in effect are mooted in retrial. Of these are the questions regarding the surprise nature of testimony from Jeffrey Beals the numerous complaints regarding the preliminary court order, argument and jury instructions. Since this court reverses the partial summary judgment, the resolution of these aforementioned issues would be unnecessary.

Annotated section 47-50-109, provides as follows:

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

Tenn. Code Ann. § 47-50-109 (1995). Much discussion took place at trial and on appeal regarding a plaintiff's burden of proof according to the statute. In view of the fact that the statute itself does not set forth a standard of proof for trebling damages, we look to case law.

With regard to procurement of breach in general, our supreme court has most recently held:

> Tennessee law recognizes both a common law action and a statutory action for unlawful inducement of a breach of contract. T.C.A. Sec. 47-50-109, *Edwards v. Travelers Insurance of Hartford, Connecticut,* 563 F.2d 105, 119 (6th Cir.1977), citing numerous cases from this Court and the Court of Appeals. T.C.A. Sec. 47-50-109 is but a statutory declaration of the common law tort action, expressly substituting treble damages for punitive damages. *Emmco Insurance Company v. Beacon Mutual Indemnity Company,* 204 Tenn. 540, 322 S.W.2d 226, 231 (1959). The statute provides for mandatory treble damages in the event there is a "clear showing" that the defendant induced the breach. *Continental Motel Brokers, Inc. v. Blankenship,* 39 F.2d 226, 229 (6th Cir.1984).

*Polk & Sullivan v. United Cities Gas,* 783 S.W.2d 538, 542 (Tenn. 1989). The court in *Polk & Sullivan* followed a well-worn path by using a statement which dates back to the first Tennessee Supreme Court case concerning the effect of the treble damages statute.

> The Code Section relied on (47-1706, T.C.A.) and made the basis of this action under the Second Count of the declaration contemplates the improper inducement, and we might add the unlawful conduct, of the alleged wrongdoer whereby a contract is broken. The statute contemplates the imposition of a severe penalty, "and should not be enforced except upon a clear showing." *Lichter v. Fulcher,* 22 Tenn.App. 670, 125 S.W.2d 501, 508.

Considering the intention of the Legislature in passing the statute relied on (T.C.A. Sec. 47-1706), we think it was designed as a protection against wilful wrongs, such as inducing employees to break their contract with their employer which would result in injury and damage to the latter's business interest. The statute is declaratory of the common law except as to the *amount* of damages that may be recovered against a wrongdoer.

*Emmco Ins. Co. v. Beacon Mut. Indem. Co.,* 204 Tenn. 540, 550-51, 322 S.W.2d 226, 231 (1959) (emphasis added). *See also Dynamic Motel Mgmt., Inc., v. Erwin* 528 S.W.2d 819 at 822 (Tenn. Ct. App. 1975); *Edwards v. Travelers Ins. of Hartford, Conn.,* 563 F.2d 105, 119-20 (6th Cir. 1977); *Continental Motel Brokers, Inc. v. Blankenship,* 739 F.2d 226, 229-30 (6th Cir. 1984).

While this treble damage statute has been in effect since 1907, no case seems to have directly addressed the charge to the jury as to the burden of proof. In *Myers v. Pickering Firm, Inc.*, 959 S.W.2d 152 (Tenn. Ct. App. 1997), the third issue raised on appeal by the defendant cast in treble damages under the statute was: "3. Whether the court erred in not defining the correct burden of proof to the jury in regard to the statutory procurement of breach of contract claim of MK" 959 S.W.2d at 155.

Since the court of appeals then affirmed the action of the trial judge in granting judgment notwithstanding the verdict on the action based upon the procurement of the breach of contract, this third issue was not addressed. "In view of our ruling on MK's first two issues, we pretermit MK's third issue." 959 S.W.2d at 162.

Appellee argues against interpreting the language of *Emmco* and its progeny as requiring a heightened burden of proof. However, in the absence of any plain language from the statute on the subject, the "clear showing" standard of *Emmco* must prevail.

The elements of the cause under the statute are the same as under the common law action. As this court has stated previously:

We think the greater weight of authority supports the

proposition of law that before there can be a recovery for interference in the performance or the procurement of the breach of a contract, as contemplated by T.C.A. § 47-15-113, the following criteria must be met:

> 1. There must be a legal contract.
> 2. The wrongdoer must have knowledge of the existence of the contract.
> 3. There must be an intention to induce its breach.
> 4. The wrongdoer must have acted maliciously.
> 5. There must be a breach of the contract.
> 6. The act complained of must be the proximate cause of the breach of the contract.
> 7. There must have been damages resulting from the breach of the contract.

> 45 Am.Jur.2d, Interference §§ 3, 4, 5, 6, 7 and 11.

*Dynamic Motel Mgmt., Inc. v. Erwin,* 528 S.W.2d 819 at 822 (Tenn. Ct. App. 1975).

It is true that the statute is a codification of the common law rule in all respects except as to damages. *See Emmco Ins. Co. v. Beacon Mut. Indem. Co.,* 204 Tenn. 540, 551, 322 S.W.2d 226, 231(1959). In the trial court, appellee successfully argued for a "preponderance of the evidence" burden of proof.[5] This argument ignores the penal nature of the statute. Where the statute itself is silent as to burden of proof, our courts have supplied the burden. *See Emmco Ins. Co., supra* at 551, 231. *See also Lichter v. Fulcher*, 22 Tenn. App. 670, 681, 125 S.W.2d 501, 508 (1938).

## V. ELECTION

---

[5]The court below expressly found the burden of proof with regard to statutory contractual interference to be by preponderance of the evidence. Apparently questions B3-B7 on the jury verdict form were for the purposes of establishing what the court believed was the appropriate standard for the violation of section 47-50-109. The final question on the form was answered in the negative and reads as follows:

PUNITIVE DAMAGES

If you awarded [sic] answered "Yes" to questions 3 through 7 and found that Buddy Lee had suffered loss as a proximate result of the actions of William Morris Agency in response to question 7, do you find that Buddy Lee has shown by clear and convincing evidence that William Morris Agency acted recklessly, intentionally, fraudulently or maliciously?

Appellees' complaint alleges both common law and statutory inducement to breach. Upon remand the jury should be instructed regarding the required *Emmco* clear and convincing showing of intentional inducement to breach under 47-50-109 as well as the clear and convincing showing of reckless, intentional, fraudulent or malicious behavior under *Hodges v. Toof*, in accordance with the coexistence of a common law tort and statutory action for procurement of breach of contract. *See Polk & Sullivan, Inc. v. United Cities Gas Co.,* 783 S.W.2d 538 (Tenn. 1989); *see also Edwards v. Travelers Ins. of Hartford, Conn.*, 563 F.2d 105 (6th Cir. 1977). In the event that a plaintiff successfully asserts a cause of action under Tennessee Code Annotated section 47-50-109 as well as a punitive damages claim in the common law action for tortious interference with contract, plaintiff is required to elect between remedies. Plaintiff cannot have "'double redress' for a single wrong". *Purcell Enterprises, Inc. v. State,* 631 S.W.2d 401, 409 (Tenn. Ct. App. 1981). *See generally Barger v. Webb,* 216 Tenn. 275, 391 S.W.2d 664, 666-667 (1965).

On August 30, 1999, the supreme court released its opinion in *Concrete Spaces, Inc., et al v. Henry Sender, et al*, No. 01S01-9812-CH-00224 (Tenn. Aug. 30, 1999). In this opinion the supreme court carefully considered the coexistence of a common law action for breach of contract, punitive damages under *Hodges v. Toof* and the statutory remedy provided by the Tennessee Consumer Protection Act (T.C.A. 47-18-109(a)(3)(1995)). The opinion is analogous to and consistent with the continued coexistence of both the common law remedy and the statutory remedy for inducing breach of contract as such coexistence is mandated by *Polk & Sullivan, Inc. v. United Cities Gas Co.*, 783 S.W.2d 538 (Tenn. 1989). The court in *Concrete Spaces* delineates the distinction between punitive damages as required by *Hodges v. S. C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992) and treble damages as may be assessed by mandate of statute same being termed "multiple" damages.

Since under these holdings a plaintiff simultaneously may pursue a simple common law remedy, a statutory remedy seeking "multiple" damages and, as an enhancement in his common law action, "punitive" damages under *Hodges*, an election of remedies is required, at least as it relates to statutory "multiple"

damages and "punitive" damages under *Hodges*.

> Says the court:
> The doctrine of election of remedies is implicated when two inconsistent and irreconcilable remedies are available to the plaintiff to redress a single wrongful act. *See Barger v. Webb,* 391 S.W.2d 664, 667 (Tenn. 1965); *Allied Sound, Inc. v. Neely*, 909 S.W.2d 815, 822 (Tenn. App. 1995). The purpose of the doctrine is to prevent double redress for a single wrong, *see Barger*, 391 S.W.2d at 667; *Barnes v. Walker*, 199 Tenn. 364, 368, 234 S.W.2d 648, 650 (Tenn. 1950), and it requires the plaintiff in such a scenario to choose one theory of recovery under which to proceed. *See Forbes v. Wilson County Emergency Dist. 911 Bd.*, 966 S.W.2d 417, 421 (Tenn. 1998).
>
> At first glance there appears to be some discord between the doctrine of election of remedies and Tenn. R. Civ. P. 8.01, which grants a plaintiff wide latitude in pleading alternative claims for relief and pursuing an array of theories of recovery in a single action. A common example of this friction occurs when a plaintiff seeks multiple damages under an available statutory remedy as well as punitive damages pursuant to a common law claim. While this type of alternative pleading is available under Tenn. R. Civ. P. 8.01, double recovery may occur if the jury decides that the plaintiff is entitled to both punitive damages and multiple damages.
>
> Almost every jurisdiction addressing this question has concluded that recovery of both multiple statutory damages and punitive damages constitutes an impermissible double recovery because the two forms of enhanced damages serve the same functions. The purpose of punitive damages is not to compensate the plaintiff but to punish the wrongdoer and to deter others from committing similar wrongs in the future. *See Coffey v. Fayette Tubular Prod.*, 929 S.W.2d 326, 328 (Tenn. 1996); *Hodges*, 833 S.W.2d at 900. Several Tennessee statutory schemes achieve the same objective of punishment and deterrence through multiple damage provisions, which allow for compensatory damages to be trebled if the defendant's conduct rises to a specified level of culpability. Because multiple damages are punitive in nature and not intended to compensate for the plaintiff's injury, *see Smith Corona Corp. v. Pelikan, Inc.*, 784 F. Supp. 452, 483 (M.D. Tenn. 1992); *Lien v. Couch*, 993 S.W.2d 53, 58 (Tenn. App. 1998), a plaintiff cannot recover both punitive damages and multiple damages in the same cause of action, even if they are each available, because receipt of both forms of enhanced damages violates the principle against double recovery. *See Edwards v. Travelers Ins. of Hartford, Conn.*, 563 F.2d 105, 119-120 (6th Cir. 1977); *Lorentz*, 834 S.W.2d at 320 (Tenn. App. 1992).

*Concrete Spaces, Inc., et al v. Henry Sender, et al*, No. 01A01-9812-CH-00224, 1999 WL 668744, ** 4-5 (Tenn. Aug. 30, 1999) *footnotes omitted*.

19

Having thus analyzed the problems involved in the necessary election of remedies which prevents double recovery, the court then proceeds to align Tennessee with what is referred to as the majority rule.

When a plaintiff is entitled to both punitive damages in conjunction with a common law claim for relief and to treble damages under a statutory scheme, the majority of jurisdictions employ a version of the election of remedies doctrine to prevent double recovery of enhanced damages. Commentators suggest that two general trends have developed with respect to how and when the plaintiff's election is to be implemented. The most prevalent approach allows the plaintiff to submit to the fact finder all theories of recovery, including the standards for both punitive damages and multiple damages. If the jury (and judge, in some instances) determines that the plaintiff is entitled to both forms of enhanced damages, the plaintiff may request that the amount of damages under each remedy be determined before making an election of which remedy he or she would like the judgment to reflect.

Two objectives are achieved by allowing the plaintiff to select an award of damages after the judge and jury have decided all the issues surrounding liability and the entitlement and amount of enhanced damages: one, improper double recovery is prevented, and two, the goal of deterrence is realized. *See Eastern Star, Inc. v. Union Bldg. Materials Corp.*, 712 P.2d 1148, 1159 (Haw. 1985). Most courts that have adopted this approach agree with the rationale of the court in *Mapp v. Toyota World, Inc.*, 344 S.E.2d 297, 301 (N.C. 1986), which observed that "it would be manifestly unfair to require plaintiffs in such cases to elect before the jury has answered the issues and the trial court has determined whether to treble the compensatory damages found by the jury . . . ." Moreover, submitting incompatible and alternative theories of recovery to a jury creates no conflict or duplicative award because until the jury makes its findings of liability, no double recovery can exist. Any duplicative aspect of the jury's findings is eliminated when the plaintiff makes an election. *See Butler v. Joseph's Wine Shop, Inc.*, 633 S.W.2d 926, 933 (Tex. App. 1982). Another advantage to letting the fact finder decide each theory of recovery is that all the findings on liability and damages are preserved for review. *See SuperTurf*, 660 F.2d 1275, 1279 (8th Cir. 1981).

\* \* \*

We agree with the reasoning of the majority of jurisdictions confronted with this issue that it would be unfair to require election before a determination of liability and entitlement to punitive damages and multiple damages has been made. In so concluding, we agree with the plaintiffs that this approach does not unduly burden a defendant who has been found liable under more than one theory of recovery. The majority rule simply allows a plaintiff to realize the maximum recovery available under the fact finders' findings. Given the punitive and deterrent purposes of punitive and multiple damages, such a result is entirely proper.

The majority approach is also consistent with our Rules of Civil Procedure, which reflect the notion that plaintiffs are free to pursue several alternative theories of recovery and to structure their claims in the manner that is most beneficial to them. Again, the election of remedies doctrine serves only to prevent double redress for a single wrong. *See Wimley v. Rudolph*, 931 S.W.2d 513, 515 (Tenn. 1996); *Allied Sound, Inc.*, 909 S.W.2d at 822. If a defendant has been found liable under more than one theory of recovery, no inequity results from allowing the plaintiff to choose one of the claims upon which to realize its maximum recovery of enhanced damages. In other words, no danger of double recovery exists unless the plaintiff actually realizes satisfaction of both forms of enhanced damages. *See Freeman v. Myers*, 774 S.W.2d 892, 895 (Mo. App. 1989).

*Concrete Spaces, Inc., et al v. Henry Sender, et al*, No. 01A01-9812-CH-00224, 1999 WL 668744, ** 5-6 (Tenn. Aug. 30, 1999).

Having now settled the law as to the continued coexistence of common law remedy, statutory remedy seeking "multiple damages," and common law remedy enhanced by "punitive damages" under *Hodges*, and the question of election of remedies where "multiple damages" and "punitive damages" are both involved, the court moves on to the problem who makes culpability determinations.

## VI.  WHO DECIDES CULPABILITY?

We must first note the distinction between Tennessee Code Annotated section 47-18-109(a)(3), the statute providing for treble damages under the Consumer Protection Act as was involved in *Concrete Spaces,* and Tennessee Code Annotated section 47-50-109, which is the general treble damage statute for inducing breach of contract involved in the case at bar. Tennessee Code Annotated section 47-18-109(a)(3) and (4), provide:

> If the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damage sustained and may provide such other relief as it considers necessary and proper.
> In determining whether treble damages should be awarded, the trial court may consider, among other things:
> (A)  The competence of the consumer or other person;
> (B)  The nature of the deception or coercion practiced upon the consumer or other person;
> (C)  The damage to the consumer or other person; and

> (D) The good faith of the person found to have violated the provisions of this part.

Tenn. Code Ann. § 47-18-109(a)(3)(4)(1995).

The supreme court in *Concrete Spaces* makes it clear that under this statute it is the trial judge and not the jury that decides whether the defendant's violation was knowing and willful and further, the trial judge and not the jury who considers the four elements of Tennessee Code Annotated section 47-18-109(a)(4), in determining whether or not to grant treble (multiple) damages. *Concrete Spaces* at * 9, fn. 13.

Tennessee Code Annotated section 47-50-109, which is the treble damage statute in issue in this case, provides:

> It is unlawful for any person, by inducement, persuasion, misrepresentation, or other mens, to induce or procure the reach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

Tenn. Code Ann. § 47-50-109 (1995).

It is readily seen that this statute does not specifically provide whether the jury or the trial judge is to make the requisite culpability findings for the imposition of treble (multiple) damages. Neither does the statute specifically address the question of whether the burden of proof necessary to establish the right to treble (multiple) damages is by a mere preponderance of the evidence or by a clear and convincing evidence standard. As noted, *supra*, the burden of proof not specifically addressed in the statute has long been settled as being a "clear and convincing evidence" burden. *See Emmco Ins. Co.* and *Lichter, supra*.

*Concrete Spaces* gives some guidance for applying Tennessee Code Annotated section 47-50-109 but does not address the issue of who makes the determination of culpability where the trebling statute is silent on this point. The *Concrete Spaces* court says:

If a statutory remedy requires the jury to make a determination of the requisite culpability for multiple damages, the jury should be required to make that determination on its special verdict form. Alternatively, if the statute requires the trial court to assess whether multiple damages are warranted, as does the Tennessee Consumer Protection Act, then the issue of multiple damages should be decided by the trial court, after the jury renders an initial determination of liability, regardless of whether the jury has also awarded punitive damages pursuant to a common law claim. In the same manner, if punitive damages are sought, and the jury finds that the defendant acted intentionally, fraudulently, maliciously or recklessly in accordance with *Hodges*, 833 S.W.2d at 901, the plaintiff may then request a hearing to calculate the amount of the award. Only after the amount of punitive damages and multiple damages have been assessed is the plaintiff required to make an election between the two types of remedies.

*Concrete Spaces, Inc., et al v. Henry Sender, et al*, No. 01A01-9812-CH-00224, 1999 WL 668744, * 8 (Tenn. Aug. 30, 1999).

We find that the requisite culpability determination under Tennessee Code Annotated section 47-50-109 must be made by the jury under proper instructions from the trial court.

VII.    JURY INSTRUCTIONS

First of all, since Tennessee Code Annotated section 47-50-109 is simply declaratory of the common law except as to damages, *Emmco Ins. Co. v. Beacon Mut. Indem. Co.*, 322 S.W.2d 226, 231 (Tenn. 1959), and since the common law remedy continues to be viable, coexistive with this statutory treble (multiple) damage statute, *see Polk & Sullivan v. United Cities Gas Co.*, 783 S.W.2d 538, 542 (Tenn. 1989), it is evident that the jury should first be instructed as to the elements of the common law remedy and the burden of proof necessary to establish the common law remedy for compensatory damages, without regard to such burden of proof as is necessary to establish liability for statutory treble (multiple) damages or necessary to establish liability for "punitive" damages under *Hodges*.

The seven elements necessary to establish liability under the common law for interference in the performance or procurement of the breach of a contract are

23

the same seven elements set forth in *Dynamic Motel Management, Inc. v. Erwin*, 528 S.W.2d 819, 822. These elements are:

1. There must be a legal contract.
2. The wrongdoer must have knowledge of the existence of the contract.
3. There must be an intention to induce its breach.
4. The wrongdoer must have acted maliciously.
5. There must be a breach of the contract.
6. The act complained of must be the proximate cause of the breach of the contract.
7. There must have ben damages resulting from the breach of the contract.

528 S.W.2d 819, 822.


These seven elements in *Dynamic Motel* were copied from the common law elements asserted in 45 Am. Jur. 2d *Interference* §§ 3-7, 11 (1999). The burden of proof necessary to establish the common law action for compensatory damages is a preponderance of the evidence standard as to these seven elements and the jury should be so charged.


Secondly, the jury should be charged under Tennessee Code Annotated section 47-50-109 as to these same seven elements but the burden of proof necessary to establish these elements under the trebling statute should be "clear and convincing evidence." *Emmco Ins. Co. v. Beacon Mut. Indem. Co.*, 322 S.W.2d 226; *Lichter v. Fulcher*, 125 S.W.2d 501, 508. Upon a finding by the jury of all seven of the *Dynamic Motel* factors by a clear and convincing evidence standard, treble (multiple) damages are automatic.


The jury should also be charged under *Hodges v. Toof* as to whether or not plaintiff is entitled to punitive damages. If the jury responds in the affirmative, then the bifurcated hearing contemplated by *Hodges* as to the amount of punitive damages must occur under *Hodges'* instructions. When the jury returns with its verdict as to the amount of punitive damages following the bifurcation hearing, then and then only the plaintiff must elect whether he will take the multiple damages assessed under the trebling statute or the punitive damages awarded under *Hodges*. He cannot have both.

VIII.   CONCLUSION

The judgment of the trial court is reversed and the case remanded for a new trial consistent with this opinion.


Costs are assessed against the appellee for which execution may issue.



_____
WILLIAM B. CAIN, JUDGE


CONCUR:


_____
BEN H. CANTRELL, P.J., M.S.


CONCURRING IN PART
AND DISSENTING IN PART
WILLIAM C. KOCH, JR., JUDGE