**CAMBIO HEALTH SOLUTIONS, LLC et al.**

v.

**Thomas M. REARDON.**

Supreme Court of Tennessee, at Knoxville.

Oct. 4, 2006 Session.

Dec. 14, 2006.

Thomas O. Helton, Chattanooga, Tennessee, Lawrence S. Eastwood, Jr., and Preston A. Hawkins, Nashville, Tennessee, for the petitioners, Cambio Health Solutions, LLC, Triad Hospitals, Inc., Quorum Health Resources, LLC, and Intensive Resource Group, LLC.

James F. Sanders and W. David Bridgers, Nashville, Tennessee, for the respondent, Thomas R. Reardon.

## OPINION

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which JANICE M. HOLDER, CORNELIA A. CLARK, and GARY R. WADE, JJ., and ADOLPHO A. BIRCH, JR., Sp. J., joined.

In federal district court, a jury awarded an employee compensatory damages against his employer for breach of contract and punitive damages against his employer's parent corporations for intentional interference with contract. The employer and parent corporations appealed to the United States Court of Appeals for the Sixth Circuit, which certified a question of law to this Court: Whether a parent company's qualified privilege to cause a wholly-owned subsidiary to breach a contract without incurring tort liability applies when the parent company only has a majority interest in the subsidiary. We hold that it does not.

### Facts and Procedural History

Because this case comes to us as a certified question of law,[1] we summarize the relevant facts based on the certification order of the United States Court of Appeals for the Sixth Circuit. On September 1, 1999, Cambio Health Solutions, LLC (Cambio) hired Thomas M. Reardon (Reardon) as its CEO. Reardon and Cambio entered into an executive consulting agreement (the "Agreement") to govern the terms of Reardon's employment. The Agreement provided that upon a "change in control" at Cambio or Intensive Resource Group, LLC (IRG), which at the

1. "The Supreme Court may, at its discretion, answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, a District Court of the United States in Tennessee, or a United States Bankruptcy Court in Tennessee. This rule may be invoked when the certifying court determines that, in a proceeding before it, there are questions of law of this state which will be determinative of the cause and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court of Tennessee." Tenn. Sup.Ct. R. 23, § 1.

time of the Agreement owned a majority of Cambio's stock, Reardon would have the option to terminate his employment for "good reason" and receive severance pay. The Agreement defined "good reason" to include a failure to pay compensation and benefits. Under the Agreement, Reardon received a 10% ownership stake in Cambio.

At the time Cambio and Reardon entered into the Agreement, IRG owned 80% of Cambio's stock. The remaining shares were owned by Reardon (10%) and private investors (10%). At that time, IRG was a wholly-owned subsidiary of Quorum Health Resources, LLC (QHR), which was a wholly-owned subsidiary of Quorum Health Group (QHG). On April 27, 2001, Triad Hospitals, Inc. (Triad) acquired QHG, and QHG merged into Triad.

The Triad merger and various actions taken by IRG, QHR, and Triad after the merger marginalized Reardon's role at Cambio. On March 14, 2002, Reardon resigned from his employment with Cambio and requested severance pay under the Agreement. Reardon asserted that Triad's acquisition of QHG constituted a "change of control" under the Agreement and that his resignation was for "good reason." In response, IRG, QHR, and Triad directed Cambio to file suit in federal district court seeking a declaratory judgment that Reardon was not owed severance pay. Reardon then brought a counterclaim against Cambio for breach of contract and against IRG, QHR, and Triad (together with Cambio, referred to collectively as "the Companies") for tortious interference with contract under the common law and inducement of a breach of contract under Tennessee Code Annotated section 47–50–109 (2001).

At the time of the alleged interference, Triad owned 100% of QHR, which owned 100% of IRG, which owned between 80%

and 90% of Cambio. Reardon still owned 10% of Cambio.

At trial, the jury found that Cambio breached the Agreement by not paying severance to Reardon. The jury awarded Reardon $815,000 in compensatory damages for breach of contract. The jury also found that Triad, QHR, and IRG tortiously interfered with the contract and induced a breach of the contract in violation of Tennessee Code Annotated section 47–50–109. The jury awarded Reardon $1,800,000 in punitive damages against Triad, $3,000,000 against QHR, and $200,000 against IRG.

The Companies appealed the award of punitive damages to the United States Court of Appeals for the Sixth Circuit, arguing that the district court erred by refusing to hold as a matter of law that Triad, QHR, and IRG were privileged to interfere with Cambio's contract with Reardon.

### Analysis

■ Pursuant to Rule 23 of the Rules of the Supreme Court of Tennessee, this Court accepted certification of the following question from the United States Court of Appeals for the Sixth Circuit:

> Does a parent company's qualified privilege to interfere in the contractual relations of a wholly owned subsidiary apply when the parent company has a majority interest in the subsidiary?

Based on our decision in *Waste Conversion Systems, Inc. v. Greenstone Industries, Inc.*, 33 S.W.3d 779 (Tenn.2000), and the discussion below, we hold that the qualified privilege of a parent company to interfere in the contractual relations of a subsidiary company does not apply when the parent owns less than 100% of its subsidiary.

In *Waste Conversion*, we held that a "parent corporation has a privilege pursuant to which it can cause a wholly-owned

subsidiary to breach a contract without becoming liable for tortiously interfering with a contractual relationship." *Id.* at 780. We held that this privilege—to interfere with a contract—is a limited privilege that can be lost if the parent acts contrary to the subsidiary's economic interests or employs wrongful means. *Id.*

In acknowledging the qualified privilege, we were explicit in our reasoning: "The reason for acknowledging the privilege of a parent corporation to interfere in its wholly-owned subsidiary's contractual relations is the usual identity of interest between the subsidiary and its parent." *Id.* at 781. We explained that in such a situation, the parent and subsidiary are so closely aligned as to render them the "same entity." *Id.* at 781–82 (quoting *Am. Med. Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 336 (Tex.Ct.App.1991)).

We also cited with approval the reasoning of the United States Supreme Court in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), which involved a federal antitrust claim. *Waste Conversion*, 33 S.W.3d at 782. In *Copperweld*, the Court reasoned that a parent and wholly-owned subsidiary were not capable of conspiring with each other because they share a "complete unity of interest," guided and determined by one consciousness. 467 U.S. at 771, 104 S.Ct. 2731.

In *Waste Conversion*, we emphasized that our holding was "limited to the relationship between a parent corporation and a *wholly-owned* subsidiary." 33 S.W.3d at 781 (emphasis added). We left open the extent to which the privilege "would apply [if at all] to situations in which a parent corporation owns less than 100 percent of the stock in a subsidiary." *Id.*

The question we left open in *Waste Conversion* is the question certified to us in this case. We conclude that the privilege does not extend when a parent owns less than 100% of a subsidiary. The foundation of *Waste Conversion* and the reasoning upon which it rests is that the qualified privilege should be extended when there is a full and complete identity of interest between a parent corporation and its subsidiary. When there exists such an identity of interest, courts are justified in treating two legally separate entities as one and in extending the immunity from tortious interference that is normally enjoyed only by the parties to a contract. However, courts are not justified in extending the privilege when the interests of the parent and the subsidiary are not identical.

 In a tortious interference claim, a parent corporation and its subsidiary will usually not share an identity of interests when the subsidiary is not wholly-owned because the interests of the majority shareholder are often different from and antagonistic to the interests of the minority shareholders. Because of the competing nature of their interests, Tennessee law protects minority shareholders from majority shareholders. Under Tennessee law, a majority shareholder owes a fiduciary duty to minority shareholders. *See Nelms v. Weaver*, 681 S.W.2d 547, 549 (Tenn.1984) (citing *Johns v. Caldwell*, 601 S.W.2d 37, 41 (Tenn.Ct.App.1980)). A majority shareholder is obligated to deal fairly with minority shareholders and not to act out of avarice, malice, or self-interest. *See Nelson v. Martin*, 958 S.W.2d 643, 649 (Tenn.1997), *overruled on other grounds by Trau–Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn.2002).

Although the majority shareholder and minority shareholders do indeed share similar interests in many areas of a corporation's operations, including a financial interest in a share of the dividends, their interests in other respects, such as to the

direction and control of the company, may be quite different. *See Holloway v. Skinner*, 898 S.W.2d 793, 797 (Tex.1995) (concluding that the controlling shareholder did not share a "complete identity of interest" with the corporation despite the "substantial alignment of his interests with those of the Corporation," because the interests of the controlling shareholder and the corporation "are not of necessity identical"). All shareholders, whether they own 100% or .001% of a company, benefit when a company is profitable. But for there to be a complete identity of interest, all of their interests must be aligned so as to render the parent and the subsidiary the "same entity." *Waste Conversion*, 33 S.W.3d at 782.

This case demonstrates how easily the interests of a majority shareholder and minority shareholder can diverge, disrupting the identity of interests. Cambio, a subsidiary of IRG, entered into the Agreement with Reardon for his personal services. As part of the Agreement, Reardon received stock in Cambio, making him a minority shareholder. At the time of the execution of the Agreement, IRG owned 80% of Cambio's stock. IRG, the majority shareholder, disagreed with Reardon, the minority shareholder, concerning the benefit of Reardon's employment contract and the direction of the company. IRG, QHR, and Triad marginalized Reardon's role at Cambio and caused Cambio to breach Reardon's contract.

Pointing to our citation of *Copperweld* in *Waste Conversion*, the Companies argue that we should follow the lead of lower federal courts that have extended the holding of *Copperweld* to instances when the subsidiary is not wholly-owned. *See, e.g., Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 344–45 (N.D.Ill.1997) (holding that a parent who owned 82% of its subsidiary could not be liable under a conspiracy the-

ory because it shared a unity of interest with its subsidiary); *Leaco Enter., Inc. v. Gen. Elec. Co.*, 737 F.Supp. 605, 609 (D. Oregon 1990) (same when parent owned 92% of subsidiary). While we have approved of the reasoning in *Copperweld*, we refuse to extend its holding in the tortious interference context. *Copperweld* involved the meaning of conspiracy under section 1 of the Sherman Antitrust Act. In the antitrust context, liability depends on the competitive risk between a parent and subsidiary. The choice of a parent to organize a subsidiary is "not laden with anticompetitive risk." *Copperweld*, 467 U.S. at 773 n. 19, 104 S.Ct. 2731. In contrast, the inquiry in the tortious interference context is whether a parent and subsidiary share a complete identity of interest.

■■■ Underlying our decision in *Waste Conversion* is the basic principle under Tennessee law that a party to a contract cannot be liable for tortious interference with that contract. *Ladd v. Roane Hosiery, Inc.*, 556 S.W.2d 758, 760 (Tenn. 1977); *see also* Tenn.Code Ann. § 47–50–109 (2001) ("It is unlawful for any person ... to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto."). This principle correctly reflects the purpose of the tort of intentional interference, which is to deter *third* parties from interfering with the contractual relations of parties to a contract. The tort exists in addition to the right of a party to recover for breach of contract. *See Swift v. Beaty*, 39 Tenn.App. 292, 282 S.W.2d 655, 659 (1954) (stating that a plaintiff's right to recover for interference with contract "is in no way affected by the fact that the injured party also has a right of action in contract against the defaulting party to the contract"); *see also Ladd*, 556 S.W.2d at 760 ("An individual has a property interest in his labor, and the right to work without

unjustified interference. One who intentionally interferes with this right ... is liable in tort for the resulting damages.") (citation omitted).

Based on the principle that a party to a contract cannot be liable for tortious interference with the performance of that contract, we have recognized that a corporate director, officer, or employee is generally not liable for interference with the corporation's contracts. *See Forrester v. Stockstill,* 869 S.W.2d 328, 333 (Tenn.1994). In *Forrester,* the plaintiff alleged that Stockstill, a corporate director and officer, and Kisabeth, a director and former corporate officer, induced a breach of the plaintiff's employment contract. *Id.* at 329. The defendants argued that they were not liable because they acted within the scope of their duties. *Id.* at 333. We found that there was no evidence that the defendants acted for any purpose other than the best interest of the corporation. *Id.* at 334. We concluded:

> [W]hen an officer, director, or employee of a corporation acts within the general range of his authority, and his actions are substantially motivated by an intent to further the interest of the corporation, in claims of intentional interference with employment, the action of the officer, director, or employee is considered to be the action of the corporation and is entitled to the same immunity from liability.

*Id.* at 334–35.

Following the same principle that a party to a contract cannot be liable for interfering with the performance of that contract, we recognized in *Waste Conversion* that a parent corporation has a qualified privilege to interfere in the contractual relations of a wholly-owned subsidiary. *See Waste Conversion,* 33 S.W.3d at 780. Under those circumstances, the parent is considered to be a party to the contract, and not a third party, because it shares a complete identity of interest with the subsidiary. But when the parent is not the sole shareholder, the interests of the parent and the subsidiary will not always be identical. This distinction is crucial because the whole issue of extending the qualified privilege depends on a complete identity of interest, such that two separate entities are treated as one. When the interests of a parent and subsidiary are not identical, the reason for treating them as the same entity disappears. In that case, the parent should not be considered a party to the contract so as to protect it from liability for interference with contract.

 Having availed themselves of the benefits of separate corporations, the Companies argue that we should now disregard their corporate structure in order to shield them from liability. Under Tennessee corporation law, a corporation and its shareholders are distinct entities. *See Hadden v. City of Gatlinburg,* 746 S.W.2d 687, 689 (Tenn.1988); *Gen. Tel. Co. v. Boyd,* 208 Tenn. 24, 343 S.W.2d 872, 875 (1960). The separate legal status of a corporation protects its shareholders from direct responsibility for the corporation's debts and other liabilities, except in rare circumstances when a plaintiff is successful in persuading a court to disregard the separate corporate entity, also referred to as "piercing the corporate veil." *See Cont'l Bankers Life Ins. Co. v. Bank of Alamo,* 578 S.W.2d 625, 631 (Tenn.1979). To pierce the corporate veil, a plaintiff must make more than a showing that a parent controls a subsidiary; the plaintiff must also show that a shareholder exercised complete control over a subsidiary and used that control to commit fraud or a wrong. *Id.* at 632. Because we respect the separate legal status of a corporation and its shareholders, we are equally reluc-

tant to disregard corporateness to create liability as we are to disregard corporateness to remove liability. Therefore, we refuse to treat a parent and subsidiary as one corporation for the purposes of extending the qualified privilege when the parent is not the sole shareholder.

While other jurisdictions have recognized that a parent has a qualified privilege to interfere in the contracts of its wholly-owned subsidiary, most of those jurisdictions have not considered whether the privilege should apply when the parent owns less than 100% of its subsidiary. This is because in most cases in which the qualified privilege has been recognized, the parent corporation owned 100% of its subsidiary. *See, e.g., Boulevard Assocs. v. Sovereign Hotels, Inc.,* 72 F.3d 1029, 1036 (2d Cir.1995) (applying Connecticut law); *Green v. Interstate United Mgmt. Servs. Corp.,* 748 F.2d 827, 831 (3d Cir.1984) (applying Pennsylvania law); *James M. King & Assocs., Inc. v. G.D. Van Wagenen Co.,* 717 F.Supp. 667, 681 (D.Minn.1989) (applying Minnesota law); *Bendix Corp. v. Adams,* 610 P.2d 24, 31–32 (Alaska 1980); *T.P. Leasing Corp. v. Baker Leasing Corp.,* 293 Ark. 166, 732 S.W.2d 480, 483 (1987); *Lachenmaier v. First Bank Sys., Inc.,* 246 Mont. 26, 803 P.2d 614, 619 (1990); *Valores Corporativos, S.A. v. McLane Co.,* 945 S.W.2d 160, 168 (Tex. App.1997). In our research, we have found only three cases that have applied the qualified privilege to a parent corporation that owns less than 100% of its subsidiary. *See Phil Crowley Steel Corp. v. Sharon Steel Corp.,* 782 F.2d 781, 783 (8th Cir.1986) (applying Missouri law when parent owned 86% of subsidiary); *Paglin v. Saztec Int'l, Inc.,* 834 F.Supp. 1184, 1195 (W.D.Mo.1993) (same when parent owned 80% of subsidiary); *Hansen v. Transworld Wireless TV, Inc.,* 111 Wash.App. 361, 44 P.3d 929, 936 (2002) (parent owned 66 2/3% of subsidiary). And of those cases, only

*Hansen* found that the parent corporation was not liable for tortious interference. *Hansen,* 44 P.3d at 936; *see also Phil Crowley Steel,* 782 F.2d at 784 (holding that the parent corporations' interference was not justified when they acted with an improper purpose); *Paglin,* 834 F.Supp. at 1196 (finding evidence that parent corporation acted with an improper purpose). In *Hansen,* the court recognized that the interests of a subsidiary that is not wholly-owned may be more divergent from its parent's interests than the interests of a wholly-owned subsidiary. 44 P.3d at 936 n. 7. Nevertheless, the court concluded that "it still is incumbent on the party opposing summary judgment to articulate those diverging interests." *Id.* We disagree that the plaintiff should have this burden or that the trial court or a jury should have to make such a determination.

In adopting the bright line rule that the privilege does not extend unless the parent corporation owns 100% of a subsidiary, we reject a rule that would require trial courts to determine, on a case by case basis, whether the interests of a parent and subsidiary are identical when a parent is alleged to have tortiously interfered in the affairs of its subsidiary. If we were to decide otherwise, trial courts would be required to inquire into all the interests of majority and minority shareholders and into the motives and means of the majority shareholder, an inquiry that could not be resolved by referring to the ownership interest of the majority shareholder. In effect, trial courts would be required to conduct a trial within a trial to determine whether a parent and subsidiary shared an identity of interest. In light of our reasoning in this case, we believe that imposing such a great burden on trial courts would be inappropriate.

 We are also concerned with adding yet another element to be proved

by plaintiffs seeking punitive damages for tortious interference. The tort of intentional interference with contract is well-established in Tennessee statutory and common law. *See Baldwin v. Pirelli Armstrong Tire Corp.*, 927 F.Supp. 1046, 1055 (M.D.Tenn.1996) (tracing the statutory action to 1907 and the common law action to 1914). In addition to proving the elements of the tort, a plaintiff seeking punitive damages for tortious interference with contract must prove that the defendant acted either intentionally, fraudulently, maliciously, or recklessly. *See Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn.1996). And because "punitive damages are to be awarded only in the most egregious of cases," a plaintiff must prove this element by clear and convincing evidence. *Id.* Thus, a plaintiff seeking punitive damages for tortious interference must already overcome a high burden of proof. Because the tort of intentional interference properly reflects the policy of this State to discourage third parties from interfering with the contractual relationship of the parties to the contract, we are unwilling to add another obstacle by extending the qualified privilege.

### *Conclusion*

For these reasons, we hold that the privilege of a parent corporation to interfere with the contractual relations of a subsidiary corporation does not apply when the parent owns less than 100% of its subsidiary.

Having answered the certified question, the Clerk is directed to transmit a copy of this opinion in accordance with Tennessee Supreme Court Rule 23(8).

Costs in this Court are taxed equally to the petitioners, Cambio Health Solutions, LLC, Triad Hospitals, Inc., Quorum Health Resources, LLC, and Intensive Re-source Group, LLC, for which execution may issue if necessary.