**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0159n.06
Filed: February 27, 2007

**Nos. 04-6485 and 05-5041**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| CAMBIO HEALTH SOLUTIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| THOMAS M. REARDON, | ) | MIDDLE DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellee | ) | |
| Cross-Appellant, | ) | |
| | ) | |
| CAMBIO HEALTH SOLUTIONS, L.L.C.; | ) | |
| TRIAD HOSPITALS, INC.; QUORUM | ) | |
| HEALTH RESOURCES, L.L.C.; and | ) | |
| INTENSIVE RESOURCE GROUP, L.L.C., | ) | |
| | ) | |
| Defendants-Appellants | ) | |
| Cross-Appellees. | ) | |

Before: DAUGHTREY and SUTTON, Circuit Judges.[*]

SUTTON, Circuit Judge. Does a parent company holding a majority, but less than a 100%, interest in its subsidiary enjoy a qualified privilege to interfere with the contractual relations of that subsidiary? After determining that this question of state law remained an open one in Tennessee—and one upon which much of the $5.9 million jury verdict in this case turned—we

---

[*] The Honorable David A. Nelson participated in the oral argument in this case but did not participate in this decision due to his retirement effective July 31, 2006.

certified the question to the Tennessee Supreme Court. Having now learned from our sister court that a company with less than a 100% interest in a subsidiary does not have a qualified privilege to interfere with the contractual relations of the subsidiary under Tennessee law, we affirm the jury's verdict for Thomas M. Reardon on his claims against Triad Hospitals, Inc., Quorum Health Resources and the Intensive Resource Group for tortious interference with contract and procurement of a breach of contract. We thus reject this and several other challenges to the jury verdict, and we now affirm.

I.

On September 1, 1999, Thomas M. Reardon began working as the CEO for Cambio Health Solutions, LLC (Cambio), which provides consulting services to healthcare providers. Under the terms of his executive consulting agreement with Cambio, Reardon could terminate his employment with the company for "good reason" following a "change in control" at Cambio or Intensive Resource Group, LLC (IRG). IRG had an 80% interest in Cambio; Reardon obtained a 10% interest in the company as part of his compensation; and private investors held the remaining 10% interest in Cambio.

Making matters more complicated, IRG was a wholly owned subsidiary of Quorum Health Resources (QHR), which itself was wholly owned by Quorum Health Group (QHG). In April 2001, Triad Hospitals, Inc. acquired and absorbed QHG through a merger. That October, Dan Moen became an officer of Triad and CEO of QHR.

Convinced that the April 2001 merger had effectively stripped him of his responsibilities, particularly when considered in conjunction with actions taken by Moen and others after the merger, Reardon notified Cambio in a letter dated March 14, 2002, that he was terminating his employment with the company. The "change in control" stemming from the April 2001 merger, he explained, amounted to a "good reason" for leaving the company, and he thus demanded that Cambio pay him the severance benefits owed under the consulting agreement.

In response, Cambio filed this lawsuit in federal district court seeking a declaration that a change in control had not taken place. Reardon, in turn, filed a counterclaim against Cambio alleging breach of contract and named IRG, QHR and Triad as additional defendants in the lawsuit, bringing claims against the latter three companies for common law tortious interference with contract and statutory procurement of a breach of contract. *See* Tenn. Code Ann. § 47-50-109.

Reardon filed a motion for partial summary judgment, contending that as a matter of law a change in control had occurred as a result of the Triad–QHG merger. The district court granted the motion.

The parties proceeded to trial on the remaining issues. The jury found that Cambio had breached the agreement and awarded Reardon $815,000 in compensatory damages. The jury also found IRG, QHR and Triad liable on the tortious interference and procurement of a breach of contract claims, awarding $1,800,000 in punitive damages against Triad, $3,000,000 against QHR and $200,000 against IRG. Reardon, in response, filed a notice of election of remedies asking for

common law punitive damages for the Triad and QHR awards but seeking statutory treble damages for the IRG award, all of which would have allowed him to recover $1,768,582.36 from IRG instead of $200,000 from this company. The district court denied Reardon's split-remedy request and entered judgment on the jury verdict. The companies filed renewed motions for judgment as a matter of law, new trial and remittitur, each of which the district court denied.

## II.

The companies on appeal urge us to grant their motion for judgment as a matter of law on several issues and to order a new trial on several others. They also seek to eliminate the punitive damages award or at least to reduce it. Reardon, for his part, contends that he should have been permitted to split his remedies and cross-appeals from the district court's denial of that request.

## A.

In reviewing the district court's denial of a Rule 50 motion for judgment as a matter of law, we give fresh review to legal questions. *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir. 1996). "Judgment as a matter of law is appropriate only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078 (6th Cir. 1999). As to questions of fact regarding the sufficiency of the evidence, we look to the law of the forum state, *K & T Enters.*, 97 F.3d at 176, which tells us (unsurprisingly) to "discard all countervailing evidence, take the strongest legitimate view of the evidence in favor of the non-moving party, and allow all

reasonable inferences in his favor," *Mairose v. Fed. Express Corp.*, 86 S.W.3d 502, 511 (Tenn. Ct. App. 2001).

IRG, QHR and Triad initially argue that, as a matter of law, they had authority to interfere with the consulting agreement between Cambio and Reardon because they held a majority interest in Cambio. In doing so, they ask us to extend the holding in *Waste Conversion Sys., Inc. v. Greenstone Indus., Inc.*, 33 S.W.3d 779, 784 (Tenn. 2000)—which provides a qualified privilege for parent companies to interfere in the contracts of their *wholly-owned* subsidiaries—to parent companies with mere *majority interests* in their subsidiaries. Thinking that the Tennessee Supreme Court was better equipped to decide this important matter of state law than we are, we certified the following question to that Court: "Does a parent company's qualified privilege to interfere in the contractual relations of a wholly-owned subsidiary apply when the parent company has a majority interest in the subsidiary?"

The Tennessee Supreme Court, with our gratitude, recently answered the certified question. The rationale behind granting the privilege to the parent company of a wholly-owned subsidiary, the Court explained, does not apply when the parent owns less than 100% of its subsidiary. While the interests of a parent and wholly-owned subsidiary "are so closely aligned as to render them the same entity," the same unity of interests does not necessarily exist when the parent merely owns a majority of the subsidiary's stock. *Cambio Health Solutions, LLC v. Reardon*, __ S.W.3d __, No. M2006-00007-SC-R23-CQ, 2006 WL 3626738, at *2 (Tenn. Dec. 14, 2006). As "[t]his case demonstrates," the Court added, "the interests of a majority shareholder and minority shareholder can diverge"

- 5 -

rather "easily." *Id.* at *4. And "[w]hen the interests of a parent and subsidiary are not identical, the reason for treating them as the same entity disappears." *Id.* at *5. In the aftermath of this controlling determination of state law, we (like the district court) must reject the companies' argument that, as majority shareholders of Cambio, they were privileged as a matter of law to interfere with the Cambio-Reardon agreement.

IRG, QHR and Triad next argue that they are entitled to judgment as a matter of law because Reardon failed to show (1) that they breached the agreement or (2) that they acted with malice. We disagree.

Tennessee recognizes a statutory cause of action for procurement of a breach of contract, *see* Tenn. Code Ann. § 47-50-109, and a common law companion claim for tortious interference with contract, *see, e.g.*, *Polk & Sullivan, Inc. v. United Cities Gas Go.*, 783 S.W.2d 538, 542 (Tenn. 1989); *see also Cont'l Motel Brokers, Inc. v. Blankenship*, 739 F.2d 226, 229 (6th Cir. 1984). While the two claims share the same elements, *see Polk & Sullivan*, 783 S.W.2d at 543 ("[T]he plaintiff must prove that there was a legal contract, of which the wrongdoer was aware, that he maliciously intended to induce a breach, and there must have been a breach, proximately caused by his acts, resulting in damages."), the claims differ in two respects. The statutory claim "substitut[es] treble damages for punitive damages." *Id.* at 542. And "the statutory claim is in the nature of a penalty," so "it, unlike the common law cause of action, requires a 'clear showing' of the defendant's liability" rather than mere proof by a preponderance of the evidence. *Cont'l Motel Brokers*, 739 F.2d at 229.

The companies argue that Reardon did not produce sufficient evidence of breach, an essential element of either claim. At trial, Reardon presented two theories of breach—that Cambio failed to pay the severance benefits when they were due and that it filed a declaratory judgment action instead of invoking the agreement's mandatory dispute resolution procedure. *See* Agreement § 13 (providing for an Appeal Committee to handle disputes). By the time the issue went to the jury, the district court already had ruled as a matter of law that a change in control had occurred and no one disputed at trial that Cambio had yet to pay Reardon severance benefits. That left only the issue whether Reardon terminated the agreement for "good reason." D. Ct. Op. at 9. The agreement lists seven circumstances that would constitute "good reason," including "[a]ny material change in [Reardon's] title, authorities, responsibilities (including reporting responsibilities) which represents an adverse change from his status, title, position, or responsibilities (including reporting responsibilities)." Agreement § 8(C)(i)(a). Ample evidence supports the jury's finding that the companies materially altered Reardon's authority: After the change in control, he was ordered to report to Dan Moen, rather than to the Cambio Board; employees who once reported to him were instructed to report to Cambio's new president—a president selected through a hiring process and contract negotiation from which Reardon was excluded; and the Cambio Board saw its responsibilities significantly diminished, if not eliminated altogether.

Ample evidence also supports the jury's finding that Cambio breached the agreement by seeking a declaratory judgment. Reardon showed that the "Appeal Committee" did not meet to

evaluate and issue a "final and binding decision" on his complaint—as indeed the agreement required. *See* Agreement § 13.

Even if the evidence introduced at trial supported the jury's breach-of-contract finding, the companies persist that Reardon failed as a matter of law to prove that they acted with malice. That is so in part, the companies claim, because the district court defined malice as the "willful violation of a known right" rather than as "ill will, hatred, or personal spite," which is how the Tennessee Supreme Court defined the term in *Hodges v. S. C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992); Br. at 46. *Hodges*, however, is a retaliatory discharge case, not a tortious interference case, and it narrows the definition of *factual* malice in the context of a punitive damages claim filed after a retaliatory discharge but does not alter the existing requirement that *legal* malice be proved to establish a tortious interference claim. As it stands, the Tennessee courts continue to respect the dichotomy between factual malice and legal malice and hold that legal malice remains an element of a tortious interference claim. *See, e.g.*, *Riggs v. Royal Beauty Supply, Inc.*, 879 S.W.2d 848, 851 (Tenn. Ct. App. 1994) (approving trial court's conclusion that tortious interference requires "legal malice," which "simply means a wilful violation of a known right"); *see also Prime Co. v. Wilkinson & Snowden, Inc.*, No. W2003-00696-COA-R3CV, 2004 WL 2218574, at *4 (Tenn. Ct. App. Sept. 30, 2004) (reversing the trial court because it used the factual definition of malice rather than the legal definition); *Crye-Leike Realtors, Inc. v. WDM, Inc.,* No. 02A01-9711-CH-00287, 1998 WL 651623, at *6 (Tenn. Ct. App. Sept. 24, 1998) ("In [the procurement of breach of contract] context, malice is the wilful violation of a known right.") (internal quotation marks omitted).

On this record, a jury reasonably could conclude that the companies willfully violated Reardon's rights under the agreement. Among other reasons: the companies acted as though a change in control had occurred when they sought buyouts of minority shareholders but then disavowed that a change in control had taken place when they dealt with Reardon and his right to severance benefits; and the companies forced Reardon to run the gauntlet of a federal-court proceeding, with its costs in time and money, before they would pay the benefits that Cambio owed him.

Cambio next argues that Reardon committed a prior material breach of the agreement, which excused its breach and entitles it to judgment as a matter of law on the breach-of-contract claim. This argument, too, lacks merit. Cambio says that Reardon violated § 2(b) of the agreement by neglecting to develop a transition plan six months prior to terminating the agreement. *See* Agreement § 2(b) (providing that Reardon must "develop and implement a plan of transition . . . approved by the Board of Directors and implemented at least six months prior to the termination of this Agreement" or Reardon's "departure"). The record shows that Reardon sent a letter to Moen and QHR President James Stokes on February 6, 2002, in which he voiced concerns about his marginalization at Cambio and "point[ed] out" that the agreement required him "to develop and implement a plan of transition . . . which . . . must be approved at least six months prior to the termination of the agreement." JA 898. He would "like to remain as CEO of Cambio indefinitely," he said, if various issues could be resolved, but if the company chose not to renew his contract, he felt "an obligation to address the issue of transition." "In effect," he wrote, "I believe you already

have a successor/transition plan in mind . . . with the change of Tom Singleton's status to President

and COO. . . . Should my contract not be renewed, I would agree that Tom should be my successor."

JA 899.

Although Reardon acknowledged at trial that he wrote the letter less than six months before

he terminated the agreement, a jury reasonably could find either (1) that Moen and Stokes had

already decided on the transition plan when they named Singleton as President and COO, rendering

Reardon's obligation to do so moot, or (2) that even if Reardon breached the agreement by failing

to implement a plan, the failure at best constituted a minor, not a material, breach. All of these

arguments considered, the district court properly denied Cambio's Rule 50 motion for judgment as

a matter of law.

B.

The companies next argue that the district court abused its discretion, *see Barnes v. City of*

*Cincinnati*, 401 F.3d 729, 743 (6th Cir. 2005), in failing to grant their motion for a new trial. They

offer three theories in support of this argument, the premises for two of which we already have

rejected.

First, they argue that a new trial should be granted because the district court refused to

instruct the jury that, as majority shareholders of Cambio, they had a qualified privilege to interfere

with the Reardon-Cambio contract. But because the Tennessee Supreme Court now has declined

to extend this privilege to parent companies who own only a majority interest in their subsidiaries, *see Cambio Health Solutions, LLC*, 2006 WL 3626738, at *7, this claim must fail.

Second, the companies complain that the district court did not instruct the jury that malice requires "hatred, spite, or ill will." This claim also must fail because, as we have shown, the district court correctly defined malice as a "wilful violation of a known right."

Third, the companies maintain that the district court erred in admitting two pieces of evidence on relevance and undue-prejudice grounds: that the wife of Cambio officer David Bussone had multiple sclerosis; and that Cambio repurchased stock from other shareholders. The Federal Rules of Evidence set a low bar for relevance. *See* Fed. R. Evid. 401 (defining "relevant evidence" as "evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence") (emphasis added). Low though that bar is, the Rules also provide that relevant evidence "*may* be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403 (emphasis added).

The district court provided a thorough, and ultimately permissible, explanation for its admission of both pieces of evidence. The court admitted the evidence about Bussone's wife's illness because it gave "insight into Moen's motivations and methods," namely that Moen put Bussone to the choice of selling his shares or losing his health insurance at a time when he particularly needed it. D. Ct. Op. at 20. Any prejudice stemming from this evidence, the court

reasoned, was created by the companies themselves when Moen testified on cross-examination that Bussone was a "motivated seller," JA 530–31, eager to take the buyout to keep his health benefits, D. Ct. Op. at 20.

The court found the evidence about the buyouts relevant "because it tend[ed] to support Reardon's theory that the Companies had embarked on a plan to 'clean up' Cambio's ownership structure by consolidating ownership and purchasing minority owners' shares,"—a plan not revealed to Reardon, a plan that bolstered his theory that he had been marginalized, a plan that in short supported his termination of the agreement for "good cause." D. Ct. Op. at 19. Nor did the district court (or do we) see any undue prejudice resulting from the evidence given that "the Companies essentially admit that this evidence is not prejudicial when they argue . . . that the buyouts are not evidence of anything sinister and are not an uncommon occurrence in business." D. Ct. Op. at 19–20. No abuse of discretion occurred in the admission of this evidence.

## C.

The companies also take issue with the punitive-damages award, maintaining that insufficient evidence supports it and that it is constitutionally excessive. Under Tennessee law, punitive damages are proper "only if . . . a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Hodges*, 833 S.W.2d at 901. Ample proof permitted a jury to conclude that the companies acted *intentionally*. *See id.* ("A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result."). Reardon

introduced evidence that the companies staged the buyout of the minority shareholders; marginalized him to the point that he was forced to resign; and disregarded the agreement's efficient dispute resolution process in favor of forcing Reardon to slog out the resolution of his rights in district court.

Also unavailing is the constitutional challenge to the award. We give fresh review to the district court's assessment of the issue, *see State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003), using the Supreme Court's three guideposts to determine whether the award is "grossly excessive," *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996). We consider "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418; *see also BMW of N. Am.*, 517 U.S. at 575.

In considering the first guidepost, we ask whether: (1) the harm was physical or economic; (2) the defendants' conduct "evinced an indifference to or a reckless disregard of the health or safety of others"; (3) "the conduct involved repeated actions" or merely "an isolated incident"; and (4) the harm resulted from "intentional malice, trickery . . . deceit, or mere accident." *State Farm*, 538 U.S. at 419. The companies offer little explanation why this guidepost works in their favor—just one conclusory sentence—and apparently for good reason. Although Reardon's harm was economic in nature and the companies' conduct did not show any disregard for others' health and safety, *cf. Philip Morris USA v. Williams*, __ S. Ct. __, No. 05-1256, 2007 WL 505781 (Feb. 20, 2007), the conduct was not isolated and fairly could be considered malicious. The companies' isolation of Reardon, their

plan to buy out the minority shareholders and thus force Reardon out and their decision to file a lawsuit against Reardon rather than invoke the alternative-dispute-resolution process required by the agreement all support the award.

As to the second guidepost, the Court has "been reluctant to identify concrete constitutional limits on the ratio between harm . . . and the punitive damages award," but it has indicated that "[s]ingle-digit multipliers are more likely to comport with due process." *State Farm*, 538 U.S. at 424–25. Reardon received a total compensatory damages award of $815,000 plus $69,291.18 in prejudgment interest, bringing the total award against the companies to $884,291.18. That makes the ratio of punitive damages to compensatory damages 5.65 to 1. Not only is this well within the Supreme Court's single-digit prescription, but the companies offer no explanation why the award should be invalidated under this criterion.

The companies place most of their eggs in the third-guidepost basket, emphasizing the disparity between the award and the civil penalties available under state law for this conduct. The statutory penalty for inducing a breach of contract under state law, the companies note, is treble damages, Tenn. Code Ann. § 47-50-109, which (in their view) suggests that we should cap Reardon's $5 million punitive damages award at three times his compensatory damages award—or roughly $2.7 million. But the companies overlook the fact that Tennessee law permits a prevailing plaintiff to choose between the common-law and the statutory remedies "to realize the maximum recovery available under the fact finders' findings." *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 909 (Tenn. 1999); *see also Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d

- 14 -

343, 357 (Tenn. Ct. App. 1999). Reardon has the right, therefore, to choose the scheme that affords

him the greatest recovery—in this case, common law punitive damages—and because the award

under that scheme does not offend due process, we decline to disturb it.

The companies nevertheless maintain that they cannot be liable for punitive damages because

the jury instruction did not mention—and the verdict form did not include a blank

for—compensatory damages for the tortious interference claim. Without assessing compensatory

damages, the companies urge, the jury could not impose punitive damages. On the final day of trial,

the district court informed the parties that it planned to draft a damages instruction for the tortious

interference claim because the parties had not supplied one. Reardon's counsel stated that he

understood that the compensatory damages his client would receive on the tortious interference

claims were necessarily the same as those he would recover on his breach of contract claim, because

one of the elements of tortious interference is breach of contract. The following exchange then took

place between the companies' counsel and the district court:

> The Court: But it's your position that if they find common law interference, then automatically the damages are the same as breach of contract. They have to find breach of contract. There can't be duplicative damages, so basically that's it. . . . So we do not need any additional damages instruction on tortious interference. We just need to have them find or not that the common law or statutory seven elements have been found.
>
> Mr. Eastwood: That's our understanding too.

JA 728. Having not only failed to object to the proposed instruction and jury form, but also having

clearly endorsed it, the companies have waived this argument. *See, e.g.*, *Preferred RX, Inc. v. Am.*

- 15 -

*Prescription Plan, Inc.*, 46 F.3d 535, 547–48 (6th Cir. 1995) (finding waiver after counsel acquiesced to jury instruction including punitive but not compensatory damages for fraud claim). And because the damages flowing from the breach of contract—Reardon's lost salary and severance benefits—were the same as those stemming from the tortious interference that caused the breach, we find no plain error here. *See* Fed. R. Civ. P. 51(d)(2); *id.* at 548 (concluding that no plain error occurred because defendants' fraud "caused the breach of contract . . . . [and] the damages proximately caused by defendants' fraud and . . . breach of the contract were the same").

The companies next urge us to reduce the compensatory damages award from $815,000 to $625,205.48 because Reardon was already paid $189,794.52 in salary but allegedly performed no services for Cambio from the date of his resignation (March 14, 2002) to the date that resignation became effective (August 31, 2002). Br. at 56. Reardon's testimony, however, speaks to the contrary. *See* JA 623 (Reardon testifying he "was still involved [in Cambio's business] until August 31, 2002"); *id.* (Reardon testifying that he was told he did not have to work, but that "Mr. Moen and others asked me to follow up on various accounts, and I did"); *see also* JA 847 (letter from Chairman of Cambio's Board, stating Cambio would "pay [Reardon's] compensation for the remaining term of the agreement"). And the jury already had reduced Reardon's compensatory damages award from $854,148.72—the amount contemplated in the employment agreement—to $815,000, an amount that the district court presumed "was an equitable reduction for Reardon's reduced responsibilities during this period." D. Ct. Op. at 32. In the light of these facts, we refuse to alter the jury's award or to reverse the district court's judgment affirming it. *See, e.g.*, *Thrailkill v. Patterson*, 879 S.W.2d 836,

- 16 -

841 (Tenn. 1994) ("The amount of the verdict is primarily for the jury to determine, and next to the jury the most competent person to pass upon the matter is the judge who presided at the trial and heard the evidence."); *see also* Tenn. R. App. P. 13(d).

III.

In his cross-appeal, Reardon contends that the district court erred in refusing to grant his request for split remedies. As Reardon sees it, he should have been able to collect common-law punitive damages from QHR and Triad and statutory treble damages from IRG—which would have allowed him to collect more than $1.7 million from IRG rather than the $200,000 the jury awarded under the common law.

Tennessee allows a plaintiff who brings a common-law tortious interference and statutory procurement of a breach of contract to choose between statutory treble damages and common-law punitive damages. *See, e.g.*, *Buddy Lee Attractions*, 13 S.W.3d at 355. Reardon points us to no authority, however, saying that the plaintiff may saddle one defendant with the entire statutory penalty while seeking common law damages from the others. And several cases suggest that the plaintiff must elect *between* the two options, not *add* them up. *See Concrete Spaces*, 2 S.W.3d at 909 ("[N]o inequity results from allowing the plaintiff to choose *one* of the claims upon which to realize its maximum recovery.") (emphasis added); *Buddy Lee Attractions*, 13 S.W.3d at 355 ("[P]laintiff is required to elect *between* remedies.") (emphasis added). As the district court correctly noted, moreover, allowing Reardon to recover the entire statutory amount—more than $1.7

- 17 -

million—from IRG, the defendant the jury found least culpable, would "subvert the intent of the jury" and "significantly inflate the punishment imposed on IRG relative to the other two entities," QHR and Triad. JA 286.

IV.

For these reasons, we affirm.